JOSEPH E. BENNETT CO., INC. *vs.* FIREMAN'S FUND
INSURANCE COMPANY & others.

Suffolk.   February 5, 1962. — April 5, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Insurance,* Against vandalism, Construction of policy, On "addition."
   *Building. Swimming Pool. Practice, Civil,* Opening to jury, Ordering
   verdict. *Evidence,* Extrinsic affecting writing. *Words,* "Addition."

In passing on the propriety of ordering a verdict for the defendant upon
   the plaintiff's opening to the jury at the trial of an action, the state-
   ments made in the opening must be taken to be true.   [102–103]
Any ambiguity in a provision of an insurance policy should be resolved in
   favor of the insured.   [103–104]
An open, uncovered, outdoor swimming pool set in a terrace was not a
   building within the meaning of that word in a policy of vandalism
   insurance.   [104]
A policy of vandalism insurance issued for country club premises, which
   stated that it covered "additions" to the clubhouse and other buildings
   specifically covered, was held not to cover under the "additions" clause
   an open, uncovered, outdoor swimming pool set in a terrace near the
   rear of the clubhouse and separated from it by a portion of that terrace,
   by steps leading up to another terrace, and by the upper terrace, al-
   though there were certain connections between the pool and the club-
   house with respect to illumination, water supply, a loudspeaker, a tele-
   phone, and inclusion of use of the pool in the club membership.   [104–
   106]
In an action upon a policy of vandalism insurance issued for country club
   premises, where recovery was sought for damage done by boys to an
   outdoor swimming pool near the clubhouse under a clause in the policy
   covering "additions" to the clubhouse and other buildings specifically
   covered by the policy, it was held that there was no ambiguity in the
   "additions" clause permitting consideration of the fact that the insured
   in applying for the policy made it known to the insurer's agent that he
   wanted coverage on the pool and furnished a valuation of the pool for
   the purpose of such coverage.   [106]

CONTRACT.   Writ in Superior Court dated July 26, 1960.
The action was tried before *Forte, J.*
*Edward J. Barshak,* for the plaintiff.
*Francis E. Dooley, Jr.,* for the defendants.
CUTTER, J.   The plaintiff (Bennett) seeks to recover un-

der policies of insurance for losses occasioned by vandalism to a swimming pool on country club premises held by Bennett as mortgagee in possession. The insurance companies, among other defences, denied that the policies covered this loss. Bennett's counsel made an extended opening and offered in evidence a sample policy ''in the form of each one of the . . . policies . . . issued.'' After this opening, the trial judge directed a verdict for the defendants. Bennett claimed an exception. The significant facts are stated on the basis of the opening.

The insured premises were on a golf course. At the time of the vandalism, there were in force various policies of fire insurance, all of which included extended coverage and vandalism indorsements (''direct loss caused by [v]andalism and [m]alicious [m]ischief, being only wilful and malicious damage to or destruction of the described property and including damage to the building[s] covered hereunder caused by burglars''). Each policy also contained '' [a]lterations and [r]epairs [c]lauses.''[1] There was no specific mention of the swimming pool, as such, in the policies. Under the heading ''Description & location of property covered'' were the following items: ''Frame Bldg. (Country Club) . . . Frame Bldg. — Pro Shop Two Frame Bldgs. — Pump Houses ($500 each)  Contents of Pump Houses ($1,500

---

[1] These clauses read: ''Alterations and Repairs Clauses: (a) (This clause applies only to such item[s] that cover on or in one building.) Permission granted to make additions, alterations and repairs to the building or structure described; and this policy (in so far as it covers building or structure) shall also cover such additions, alterations and repairs when not otherwise covered by insurance, and shall cover all temporary structures, materials, equipment and supplies therefor on the premises described or within 100 feet thereof, and (in so far as it covers contents) shall also cover contents in such additions. (b) (This clause applies only to such item[s] as cover on or in two or more fire divisions.) Permission granted to make additions, alterations and repairs to the buildings or structures described, and to construct new buildings on the premises described; and this policy (in so far as it covers buildings or structures) shall also cover such additions, alterations and repairs and new buildings on the premises described when not otherwise covered by insurance, and shall cover all temporary structures, materials, equipment and supplies therefor on the premises described or within 100 feet thereof, and (in so far as it covers contents) shall also cover contents in such additions and new buildings. The above alterations and repairs clauses do not waive or modify any of the conditions of the Automatic Sprinkler Clause, if any, applying to this policy.'' See for discussion of extended and vandalism coverage, Policy, Form & Manual Analysis Service; Fire, Casualty & Surety Analyses, Fire pars. 132.23, 132.47.

each)  Situated North Street, North Reading, Massachusetts (LRD–12004)."[2]

One other provision is of significance, that defining "[b]uilding [c]overage" in what is entitled the "[g]eneral [f]orm," which reads: "Building Coverage: When this policy covers buildings, it shall cover the basic structure and additions, including foundations . . . and . . . shall include building service equipment . . .; property of the following kinds belonging to the Insured as building landlord [then are listed various types of building parts or equipment, such as refrigerating equipment, window shades, etc.] . . . and all property fastened to and made a part of the building."

Originally there was a small building on the site of the clubhouse. In 1955 Bennett as general contractor reconstructed this building into a much larger country club with clubhouse, terraces, and a swimming pool (40 by 100 feet) set in the middle of a concrete terrace. In the rear of the large building was a concrete terrace extending thirty feet from the building for almost the whole width of the building, where the members would sit and have refreshments. At the outer edge of this, twelve to fifteen steps led down a slight incline to the second concrete terrace containing the swimming pool. The large building and the terraces were used together as a unit by the members, and, from a side view they appeared to be one unit set off from the golf course.[3]

The building reconstruction started in late 1955 and was finished before the summer of 1956. Bennett took a mortgage from the club for money owed to it. On November 8, 1957, Bennett became mortgagee in possession.

---

[2] One rider, dated December 11, 1957, added references to "1–3 story frame Country Club and Contents" and to "frame fences."

[3] There were other minor connections of the pool with the clubhouse. The night illumination for the swimming pool came from spotlights on the main building, controlled from within that building. Water for the pool was brought by a pipe from the ladies' locker room in the building, controlled by valves in that locker room and at the pool. A loudspeaker near the pool was controlled from the clubhouse. A telephone at the pool connected to telephones within the building. Use of the pool was included in the club membership.

One insurance policy had been issued each spring in 1954, 1955, and 1956. Bennett's president approached Boylston Insurance Agency (Boylston), "an agent for all the defendant insurance companies . . . for the purpose of receiving information for fire and extended coverage and vandalism policies, for writing . . . policies with the approval of the companies, for countersigning the policies." He told Boylston's representatives "that he wanted . . . complete coverage, fire, extended coverage, and vandalism on the . . . [c]lub" as described above. Boylston's representatives informed him that he could not have "vandalism coverage except as part of a fire . . . policy." Bennett's president "told them to . . . write up the fire insurance policies, so long as he ha[d] extended . . . and vandalism coverage to include, among other things, the pool and the pool area." Bennett then "was sent a form, filled out by . . . Boylston . . . to give the valuations . . . for insurance purposes." Bennett's president included approximately $27,000 "for the pool and the pool area" and intended to cover the pool area for vandalism.

The earlier policies were issued as of November 8, 1957, "so far as listing . . . Bennett . . . as . . . owner." In addition to the three policies, already mentioned, issued in 1954, 1955, and early 1956, four more were issued in October, 1956, two in October, 1957, and one in February, 1958.

On the evening of October 15, 1958, when all the policies were in effect, boys "broke into the Pro shop . . . [and] stole some" articles. They then went to the pool and damaged it to the extent of $29,000, and threw articles into the pool. Within two days notice of loss was given. No settlement has been made by the insurance companies of Bennett's claims.

1. In passing upon the motion for a directed verdict upon an opening, the facts stated by counsel must be considered as true. The motion must be denied "if the statements . . . together with all rational inferences of which those facts are susceptible, can, upon any reasonable view . . . be deemed sufficient to support the . . . cause of ac-

tion." *Douglas* v. *Whittaker,* 324 Mass. 398, 399. See
*Amorosso* v. *Farina Bros. Co. Inc.* 339 Mass. 595, 596; *Sin-
garella* v. *Boston,* 342 Mass. 385, 386, 389. Cf. *Perry* v.
*Carter,* 332 Mass. 508, 509; *Mallard* v. *Waldman,* 340 Mass.
288, 290.

2.   The vandalism coverage in these policies is that listed
in the fire policies and extended coverage provisions, which
do not purport to describe the swimming pool as property
covered.   Bennett, however, seeks to recover on the theory
that the "additions" clauses (footnote 1, *supra*) and the
conversations between Bennett's president and representa-
tives of Boylston (the insurance agency) sufficed to bring
all the new construction, including the swimming pool,
within the policies.   The earlier policies (probably those of
1954, 1955, and May, 1956) were issued before the recon-
struction of the clubhouse was completed.   Bennett con-
tends that, as to these policies, the swimming pool was an
"addition," and that the later policies should be inter-
preted in the same way.   Bennett also contends (largely on
the basis of *Upper Columbia River Towing Co.* v. *Glens
Falls Ins. Co.* 179 F. Supp. 705, 707 [D. Ore.]) that the in-
surance companies, through the knowledge of their general
agents, knew that Bennett wanted vandalism coverage on
the swimming pool.   This desire, Bennett contends, was
verified by the approximately $27,000 valuation placed upon
the pool and pool area by Bennett's president.

The policies "must be reasonably construed by giving to
. . . [their] words . . . their usual and ordinary signifi-
cance . . . but if the terms . . . are ambiguous then every
doubt is to be resolved against the insurer[s]." *Woog-
master* v. *Liverpool & London & Globe Ins. Co. Ltd.* 312
Mass. 479, 481.   See *Schroeder* v. *Federal Ins. Co.* 343 Mass.
472, 475.   See also *MacArthur* v. *Massachusetts Hosp.
Serv. Inc.* 343 Mass. 670, 672.   "Where the language per-
mits two rational interpretations, that more favorable to
. . . the insured is to be taken.   The insurer chose the
words to express the contract of indemnity and whichever
of two warranted interpretations . . . best effectuates the

main manifested design of the parties is to be favored.''
*Rezendes* v. *Prudential Ins. Co.* 285 Mass. 505, 511.

These policies insure, so far as the clubhouse is concerned, a ''Frame bldg. (Country Club).'' The additions clauses (footnote 1, *supra*) permit ''additions, alterations and repairs'' to the buildings or structures described and the construction of ''new buildings on the premises.'' The policies ''in so far as . . . [they] cover buildings or structures'' will ''also cover such additions . . . and new buildings . . . when not otherwise covered by insurance.'' If the swimming pool is either a new building or an addition to the clubhouse building, the language of the policies covers it. If the pool is not a new building or an addition, the policies do not cover it.

The pool cannot be regarded as a new building. Although it is below ground, that in itself is not fatal to the contention that it is a building. See *Jenney* v. *Hynes,* 285 Mass. 332, 335. It certainly is not a structure designed for human occupancy or use except for a limited and specialized purpose, it is not covered with a roof, and it does not come within the ordinary concept of a building. See *Truesdell* v. *Gay,* 13 Gray, 311, 312.

The term ''addition''[4] most aptly describes an enlargement of what previously existed by a piece of construction of the same general character, having some definite connection and community of use with the basic building. In considering whether the swimming pool is an ''addition'' to this clubhouse, it must be recognized that any connection between the two is only by the tenuous link of the upper thirty foot wide concrete terrace, then some twelve to fif-

---

[4] ''Addition'' in respect of buildings has been defined in various ways. See, e.g., Webster's New Intl. Dictionary (2d ed.) p. 30 (''A part added to a building, either by being built so as to form one architectural whole with it, or by being joined with it in some way, as by a passage, and used so that one is a necessary adjunct or appurtenance of the other, or so that both constitute in use and purpose one and the same building''); Webster's Third New Intl. Dictionary, p. 24 (''a part added to . . . a building to increase available space'' and also, ''additions pl: facilities, structures, equipment, or other property added to what is already in service''); Black's Law Dictionary (4th ed.) p. 59 (''Structure physically attached to or connected with building itself'').

teen steps, and the apron portion of the lower concrete terrace in which the pool is set. There is, of course, a very general community of use in that the clubhouse and the pool are both used for recreation. The manner of use of the clubhouse and pool, however, is substantially different; so much so, that in ordinary parlance the use would not be thought to be the same. In at least one case, where a more substantial connection and perhaps greater proximity existed, this court treated each of two buildings resting upon separate foundations as "a separate building." *H. W. Robinson Carpet Co.* v. *Fletcher,* 315 Mass. 350, 353–354. Courts, however, have given a somewhat broader scope to the word "addition." See *Marsh* v. *New Hampshire Fire Ins. Co.* 70 N. H. 590 (adjacent engine house and "dryhouse" held "additions"); *Marsh* v. *Concord Mut. Fire Ins. Co.* 71 N. H. 253, 255–256 (existence of movable bridge and steam pipes between buildings is of some weight); *Agnew* v. *Sun Ins. Office,* 167 Wis. 456, 457 (" 'additions thereto,' when used with reference to a building, ordinarily refer to some structure physically attached to or connected with the building itself"). See also *Taylor* v. *Northwestern Natl. Ins. Co.* 34 Cal. App. 471, 473–474 (adjacent shed an "addition"); *Bickford* v. *Aetna Ins. Co.* 101 Maine, 124, 127 (separate building connected with main building by a platform, an "addition"); *Shepard* v. *Germania Fire Ins. Co.* 165 Mich. 172, 175; *Gertner* v. *Glens Falls Ins. Co.* 193 App. Div. (N. Y.) 836, 838–841; *Philadelphia Manufacturers Mut. Fire Ins. Co.* v. *Rose,* 368 Pa. 363, 368–369; *Seeds* v. *Royal Ins. Co.* 75 Pa. Super. 302, 304–305.

Bennett places great reliance on several Federal decisions. See *Pearl Assur. Co. Ltd.* v. *School Dist. No. 1,* 212 F. 2d 778, 780–782 (10th Cir.), where a large separate gymnasium connected by a steam line, water line, sewer, electric power line, and wooden passageway, was held to be within the "additions" clause of a policy, as applied to the main school building first constructed and first insured; *Fidelity–Phenix Fire Ins. Co.* v. *Farm Air Serv. Inc.* 255 F. 2d 658, 662–663 (5th Cir.), where extrinsic evidence was admitted

to explain what the court regarded as a possible ambiguity in a policy; *Upper Columbia River Towing Co.* v. *Glens Falls Ins. Co.* 179 F. Supp. 705, 708–709 (D. Ore.). None of the cases, Federal or State, already cited, purports to apply the usual "additions" clause of a fire insurance policy to anything but a building. Adjacent facilities, which were not buildings, do not seem to have been treated as "additions" in the decisions.

Although an open, uncovered swimming pool may be a "structure" (cf. *Manchester* v. *Leahy,* 336 Mass. 158, 160), it does not seem to us to come within the usual meaning of the term "addition," which in ordinary usage refers to buildings or parts of buildings. We perceive no such obscurity in the term "addition" as to warrant extrinsic evidence of negotiations as an aid to interpretation of a standard provision of the complete, integrated expression of the parties' agreement in the policies. See *Stoops* v. *Smith,* 100 Mass. 63, 65–67; *Freeman* v. *Sieve,* 323 Mass. 652, 654–655; *Dekofski* v. *Leite,* 336 Mass. 127, 128–129; *Siegel* v. *Shaw,* 337 Mass. 170, 172; Wigmore, Evidence (3d ed.) §§ 2425, 2452; McCormick, Evidence, §§ 219, 220. See also *Whitbeck* v. *Aldrich,* 341 Mass. 326, 329. Compare *Cotty* v. *Meister,* 339 Mass. 202, 204–205; *Caputo* v. *Continental Constr. Corp.* 340 Mass. 15, 18–19. This is not a suit to reform the contracts contained in the policies (cf. *DeVincent Ford Sales, Inc.* v. *First Mass. Corp.* 336 Mass. 448), or an action for failure to place requested insurance (cf. *Rayden Engr. Corp.* v. *Church,* 337 Mass. 652). It is an action at law upon the insurance policies as they were issued. Whatever might be the situation in other types of litigation about these policies, in this action, extrinsic evidence of the negotiations between Bennett and Boylston would not have been admissible. We hold that the statements in the opening in this case with respect to such negotiations were irrelevant, and do not aid Bennett.

*Exceptions overruled.*