472 So.2d 146 (1985)
JEFFERSON MARINE TOWING, INC. and Billiot Marine Towing Co., Inc.
v.
UNDERWRITERS AT LLOYD'S LONDON and/or Insurance Companies.
No. 85-CA-67.
Court of Appeal of Louisiana, Fifth Circuit.
June 3, 1985.
Writ Denied September 27, 1985.
*147 R.A. Osborne, Jr., Gretna, for plaintiffs-appellees.
Michael L. McAlpine, Sidney W. Degan, New Orleans, for defendant-appellant.
Before CHEHARDY, BOWES and GAUDIN, JJ.
BOWES, Judge.
Defendant Underwriters at Lloyd's, London and/or Insurance Companies, hereinafter referred to as "Underwriters", has perfected this appeal from a judgment of the trial court in favor of plaintiff in the sum of $79,500, plus interest. We affirm the judgment of the district court.
Plaintiffs, Jefferson Marine Towing, Inc. and Billiot Marine Towing Co., Inc., filed the present lawsuit against the insurer of the M/V La Henrietta to recover the insured value of that vessel when it sunk on or about January 29, 1981. Antoine Billiot purchased the M/V La Henrietta in 1978, originally for use as a shrimp boat. After some time, Billiot, for financial reasons, converted the vessel to use as a barge patrol boat.
The La Henrietta continued in this position until September of 1980, when engine *148 trouble developed. Mr. Billiot testified that a claim was made with Underwriters at that time, and produced, at trial, a "proof of loss" to that effect. Mr. Billiot testified that after inspection, a $10,000 claim was paid at which time no reference to the vessel's "unseaworthiness" was made by the insurer.
On or about January 8, 1981, after several months of uneventful service, Mr. Billiot determined to purchase another tug so "I could do more work for one thing." Additionally, he had decided to repair and remodel the M/V La Henrietta into a pleasure boat. There had also been damage sustained to the hull of the vessel some time in Decembera high wind had caused a barge to break away, and, in the rescue process, the barge hit the stern. The damage, or hole, was above the waterline. At that time, plaintiff Billiot attempted to repair the ship himself.
The ship had a hull of ferro cement construction, very unusual in the area, but built to usual and customary specifications.
The repairs undertaken by Billiot were only partially successful. He began to look for a shipyard which could properly repair the hull. After a number of unsuccessful attempts to find one, plaintiff contacted Ingram Concrete Structures, Inc., and spoke with Bill Ingram, president, and Charles Maxwell, a supervisor. The precise business nature of their subsequent arrangement appears uncertain. What does appear certain is that Ingram invited Billiot to bring the vessel to the Ingram facility in Slidell where the repairs would be commenced. Whether Ingram Concrete itself, or Ingram employees on their own time, were supposed to effect the repairs is vague and unclear in the absence of any written contracts.
In any case, on January 26, 1981, some weeks after taking the ship out of service, Billiot navigated the M/V La Henrietta across Lake Pontchartrain without any difficulty to the Slidell facilities of Ingram. The Ingram facility was closed when the vessel arrived and there was no watchman on duty. Mr. Billiot did not wish to moor the M/V La Henrietta directly in front of Ingram's graving dock and, as there was a small dock and other barges moored approximately one hundred yards upstream, he tied the M/V La Henrietta to that dock. Before leaving the vessel, Mr. Billiot again checked all the compartments to see that watertight integrity was maintained. The port side of the vessel (the area of damage) was facing one of the barges. Mr. Billiot left the vessel in that position and in no distress.
On the following morning, January 27, 1981, Mr. Billiot telephoned Mr. Ingram to tell him the M/V La Henrietta was at the facility; however, the telephone was not in service. Later that afternoon, he was able to reach Mr. Ingram's secretary, with whom he left a message regarding the delivery of the vessel and its location. On that Tuesday, Mr. Billiot's testimony is that he spoke directly to Mr. Ingram and was told by Mr. Ingram that he knew the boat was there and that it was all right there. He was also told that repairs could begin that weekend.
That same Tuesday or Wednesday, Mr. Wayne Grass, Ingram's maintenance superintendent, saw the M/V La Henrietta and he and another employee went on board the vessel to look at it. These two employees also were aware of the vessel's presence and that it was there for repair, although Mr. Grass did not know who was going to repair it.
Mr. Grass also saw that the vessel was taking on water and needed pumping. He saw the 3" jigger pump on the stern of the M/V La Henrietta and even remembered it appeared to be in good working order and was covered with a protective plastic. He also testified that he could have easily pumped the vessel and prevented it from going down.
Ingram's employees had on numerous occasions pumped out other vessels moored in that position to keep them from sinking, so Mr. Grass told Superintendent Maxwell that the M/V La Henrietta was taking on water and inquired if he should pump it out. Maxwell informed Grass that the vessel *149 "was not our responsibility, that Ingram Concrete didn't have anything to do with this thing ... it was not my problem, to just don't worry about it." Grass did nothingand the ship sank on Thursday afternoon.
Plaintiff filed suit against Ingram, as well as Underwriters. Underwriters filed a third party demand against Ingram. In his judgment, the trial judge found Ingram and Underwriters liable jointly and in solido, and also granted Underwriters' third party demand against Ingram. Ingram did not appeal nor answer the appeal, and all issues as to Ingram are therefore res judicata.
Underwriters alleges on appeal that plaintiff breached the "implied warranty" of seaworthiness, failed to prove its loss from an insured peril, and excessively valued the La Henrietta so as to void the insurance policy. This presents several subissues for discussion.
Underwriters has averred that the jurisprudence establishes that a maritime claim brought in a state court is controlled by the same legal principles that control actions brought in admiralty, applying Federal Maritime Law. We have no dispute with this statement. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1943).
At the same time, however, the Supreme Court in Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), recognized that in the field of maritime contracts much regulatory power is given to the states. The regulation of marine insurance has traditionally been left to the individual states. This was explained and somewhat limited in Kossick v. United Fruit Company, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), to a situation in which state law may be applied when there is a lack of any provision of maritime law governing the question presented.
As did the trial judge, we must acknowledge that the issue of seaworthiness is solidly entrenched in federal maritime law. In federal law, there exists an implied warranty of seaworthiness.
It is impliedly warranted that the vessel is seaworthy as of the very moment of the attachment of the insurance; and if the vessel is in fact unseaworthy at the time the insurance were to attach, the breach avoids the policy. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., supra. Lemar Towing, Inc. v. Fireman's Fund Insurance, 352 F.Supp. 652 (E.D.La.1972)
There was no allegation that the La Henrietta was unseaworthy at the inception of the policy. However:
Yet the implied warranty does not end there; it is a continuing obligation that the vessel "[o]wner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." Saskatchewan Government Insurance Office v. Spot Pack, supra, at 388. However, a breach of the implied negative warranty after the policy has attached does not avoid the policy altogether and only exonerates the underwriter for loss or damage proximately caused by the unseaworthy condition. Saskatchewan Government Insurance Office v. Spot Pack, supra. Lemar, supra

The origin of this rule appears to have come from Union Insurance Company of Philadelphia v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497 (1888) in which the Court stated:
In the insurance of a vessel by a time policy, the warranty of seaworthiness is complied with if the vessel be seaworthy at the commencement of the risk, and the fact that she subsequently sustains damage, and is not properly refitted at an intermediate port, does not discharge the insurer from subsequent risk or loss, provided such loss be not the consequence of the omission. A defect of seaworthiness, arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the *150 insurer from liability for any loss which is the consequence of such bad faith, or want of prudence or diligence; but does not affect the contract of insurance as to any other risk or loss covered by the policy, and not caused or increased by such particular defect.
The U.S. Fifth Circuit Court of Appeals, in Saskatchewan Government Insurance Office v. Spot Pack, 242 F.2d 385 (1957), in interpreting Union stated:
... there seems to have been slight critical awareness that the policy in Union contained not alone an express warranty of seaworthiness, but an express exclusion of losses caused by unseaworthiness or by incompetence of Master and Mariners, which might imply a contractual undertaking for a continuing obligation by Master and crew members acting generally as agents for the owners to take all prudent requisite steps to keep the ship seaworthy.
In the present case, there exists a specific warranty as to seaworthiness:
The Underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercise due diligence to maintain the Vessel in a seaworthy condition after attachment of this Policy; the foregoing, however, not to be deemed a waiver of any warranty of seaworthiness implied at law.
In summary, whether the warranty of seaworthiness is implied under federal maritime law, or specific under the insurance contract, the key phrases are "due diligence" and "prudence." The obligation of the master (insured) is to exercise ordinary prudence, and due diligence, to keep the ship seaworthy.
Seaworthiness, as that term has been defined and redefined, is reasonable fitness to perform or do the work at hand.
... The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 AMC 1503. Walker v. Harris, 335 F.2d 185 (5th Cir.1964)
The trial judge found that the facts showed the vessel crossed Lake Pontchartrain without any problem and sank for reasons not shown at trial. He was impressed with the testimony of Mr. Reimer, a marine surveyor and plaintiff's expert witness, in whose opinion the La Henrietta was seaworthy for the purpose of crossing Lake Pontchartrain and mooring for repairs. He stated Reimer's testimony was "more persuasive to the court than the other surveyors."
Although not succinctly stated, the trial judge obviously found that the ship was seaworthy in the circumstances of the case. We agree with this and also with the court's finding that there was no evidence that plaintiff Billiot failed to exercise due diligence to maintain the ship in a seaworthy condition. The ship was repaired after a serious injury, and, when those repairs began to fail, the vessel was removed from service and tendered for major repair. Thus, there was no violation of either an implied or express warranty.
Further, the unseaworthy condition must proximately cause the loss. Saskatchewan, supra. Underwriters had the burden of proving unseaworthiness, Saskatchewan, supra, and failed to sustain the burden. According to the only knowledgeable witness, the ship was checked out and taking on no water when plaintiff Billiot left it near Ingram. No witnesses were offered with knowledge of the sinking. We must conclude, as did the trial judge, that it was never proven that any allegedly unseaworthy condition of the La *151 Henrietta was the proximate cause of the loss.
Underwriters has advanced the "calm water" presumption of maritime law.
When a vessel sinks in calm water, a presumption arises that the vessel was unseaworthy in some particular. Boston Insurance Co. v. Dehydrating Process Co., 1 Cir., 1953, 204 F.2d 441. This is a rebuttable presumption and the insured can prove that the vessel was seaworthy before the sinking. Once this particular presumption is rebutted, there arises a counter presumption that the loss was caused by a "fortuitous peril of the sea". Reisman v. New Hampshire Fire Ins. Co., 312 F.2d 17 (5th Cir.1963)
In our opinion, plaintiff proved, as shown hereinabove, that the La Henrietta was seaworthy before the sinking. Therefore, the calm water presumption has been successfully rebutted.
Defendant has asserted that the plaintiff excessively evaluated the vessel, and therefore the policy is void. Billiot represented that the fair market value of the ship was $75,000 when the policy was incurred. Billiot purchased the La Henrietta for "about seventy thousand dollars", plus financing costs.
Norman Laskey, a marine surveyor testifying for defendant, stated that the value of the boat was $10,000 as of September, 1980. He reached this valuation based on the then present condition of the boat which could not be worked "as either a fish boat or for any other money making purpose commercially." Therefore, Lasky saw the only worth of the boat to be in residual value of the radar, engine, etc.
The ship was valued in good faith by Mr. Billiot at the time of the inception of the policy based on the purchase price. The survey made by Laskey considered what amounts to "scrap" value. Plaintiff obviously did not intend to scrap the vessel after the survey, or even at the time he sailed her to Ingram. Rather, he obviously intended to expend money to repair and refurbish the ship into a pleasure craft. To prevail in this issue, defendant must prove that the valuation made by Billiot was done with an intent to deceive.
To determine this, we now look to Louisiana law with reference to insurance contracts.
R.S. 22:619 states:
R.S. 22:619
Warranties and misrepresentations in negotiation; applications
A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive. "Strict proof of fraud is not required to show the applicant's intent to deceive, because of the inherent difficulties of proving one's intent. The intent to deceive must be determined from the attending circumstances which indicate the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality thereof, or from circumstances which create a reasonable assumption that the insured recognized the materiality of the misrepresentations." (citations omitted) Johnson v. Occidental Life Ins. Co. of California, 368 So.2d 1032 (La.1979)
The burden of proof is on the insurer. Morris v. Southern Life and Health Ins. Co., 430 So.2d 792 (La.App. 5th Cir.1983).
We find that Underwriters failed to carry its burden of proof in this instance. The surrounding circumstances clearly show that the valuation of the La Henrietta was made in good faith and continued so. Underwriters inspected the boat in September of 1980 relevant to another claim, and there is no evidence that defendants sought to re-value the ship for insurance purposes.
*152 As previously stated, Ingram has not appealed and judgment as to that defendant is final. Accordingly, the judgment of the trial court is affirmed as to all parties. Costs of this appeal shall be borne by appellee Underwriter's at Lloyd's.
AFFIRMED.