**WINDSOR MOUNT JOY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**John GIRAGOSIAN and Deborah Giragosian, Defendants.**

Civ. A. No. 92–11184.

United States District Court, D. Massachusetts.

Sept. 21, 1994.

Michael J. Calabro, Flanagan & Hunter, Boston, MA, for plaintiff, counter-defendant Windsor Mount Joy Mut. Ins. Co.

Thomas M. Neville, Segalini & Neville, Waltham, MA, for defendants, counter-claimants John and Deborah Giragosian.

## THE *ESCAPE*

### FINDINGS OF FACT AND RULINGS OF LAW

YOUNG, District Judge.

The plaintiff, Windsor Mount Joy Mutual Insurance Company ("Windsor"), seeks a declaration of its rights and obligations with respect to its insureds, John and Deborah Giragosian ("the Giragosians"), the owners of the ESCAPE, a 34–foot sailboat which sunk in Boston Harbor. The Giragosians counterclaim for contract damages due to Windsor's alleged improper failure to honor their insurance claim and for violations of Mass.Gen.L. chapters 93A and 176D. Following a jury-

waived trial on the merits, the Court made findings of facts and rulings of law from the bench at a June 15, 1994 hearing, and reserved the option to enter a written opinion. This is that opinion. It elaborates upon, but in no way alters, the Court's earlier findings and rulings.

In 1989, the Giragosians, Massachusetts residents, purchased the ESCAPE, a 1987 model 34–foot Catalina sailboat with a 21–horsepower diesel engine. On April 6, 1989, the Maryland National Bank issued a preferred ship mortgage in the amount of $48,-000 upon the Giragosians' $76,000 purchase price. On May 31, 1989, the ESCAPE was properly documented with the Coast Guard.

When the Giragosians purchased the vessel, she was equipped with a flare gun, eight life preservers, two anchors, a VHF–FM radio, a Ritchie magnetic compass, Loran navigation capability, and a lighted navigation station. The electronic gear was powered by batteries aboard the vessel.

After the Giragosians purchased the ESCAPE, Mr. Giragosian installed a windlass and a water heater at a cost of approximately $800. In addition, he purchased charts of the Boston area, Massachusetts Bay, and the coastline of Massachusetts, chart kits, and additional life preservers. All of the charts had Loran lines printed on them.

On March 25, 1989, Henry C. Mustin Company surveyed the ESCAPE. The Court adopts the findings of that survey. On April 1, 1989, Mr. Giragosian applied for insurance for the ESCAPE. Question three of the "Skipper Application" asked how many years experience the applicant had in operating boats. Mr. Giragosian answered "10." In addition, the application asked the type and size of the boats, and Mr. Giragosian answered "20 feet." Notes taken at the time the insurance binder was issued state that Mr. Giragosian was taking the basic Coast Guard Auxiliary boat owners course. These representations were material to the underwriting and the issuance of the insurance.

Actually, Mr. Giragosian's boating experience prior to owning the ESCAPE had been limited to vessels significantly smaller than the ESCAPE. Before purchasing the ES-CAPE, Mr. Giragosian had owned a ten-foot speedboat, a 14–foot boat, and a 17–foot boat. Furthermore, Mr. Giragosian's boating experience had been sporadic. Although he had pleasure boating experience spanning the previous ten years, it had not been every boating season, and not with boats the size of the ESCAPE. Moreover, Mr. Giragosian never did take the basic Coast Guard Auxiliary boat owners course as noted by the insurance agent.

Nonetheless, the Court finds that Mr. Giragosian had been taught to sail by a qualified Coast Guard instructor, a Mr. Menton. Mr. Menton, an experienced sailor, accompanied Mr. Giragosian on his first trips to teach him how to use the vessel, namely how to navigate and operate it. From there, Mr. Giragosian learned to navigate the boat himself either by Loran up to 20 miles offshore, or by dead reckoning in sight of shoreside landmarks. Finally, Mr. Giragosian began to operate the vessel on his own for pleasure in the areas of greater Boston and Massachusetts Bay.

In the months before the ESCAPE was lost, Mr. Giragosian's adverse experiences relating to the vessel were limited to the following: During one excursion, Mr. Giragosian ran the vessel aground, and called for help using his radio. Occasionally, the diesel engine stalled. In August, 1991, Mr. Giragosian had been out on a pleasure cruise when the engine stalled as he entered Scituate Harbor. Because he was unable to restart the engine, Mr. Giragosian obtained permission to moor the vessel in Scituate Harbor and he left it there.

On October 19, 1989, someone noticed that the ESCAPE was lying very low in the water and the Coast Guard was called to pump her out. The Coast Guard pumped out the vessel and promptly informed the Giragosians of the situation.

On October 24, 1991, Mr. Giragosian went to Scituate Harbor planning to sail the ES-CAPE to the Bay Point Marina in Quincy to have it hauled for the season. He was accompanied by his friend Daniel Likely ("Likely") who had little boating experience.

Mr. Giragosian and Likely rode in the Giragosians' six-foot inflatable boat to where the ESCAPE was moored. Once on board, they discovered that the locks to her cockpit had been changed. Mr. Giragosian came ashore and got the key from the Coast Guard station. At the Coast Guard station, there was a conversation during which it was suggested that perhaps the water had gotten into the bilges of the ESCAPE by running down the mast. Armed with the key, Likely and Mr. Giragosian motored out to the ESCAPE, got aboard, and made ready to cast off.

Before the ESCAPE left Scituate Harbor, Mr. Giragosian looked in the bilge and saw one to two inches of water. He considered this normal, and the Court finds that it was not unduly abnormal. In addition, he noticed stains or water marks indicating that there had been about six inches of water in the bilges of the ESCAPE at one time.

Mr. Giragosian unsuccessfully attempted to start the engine of the vessel—apparently it had not started since August of that year. Although he could turn on the Loran, he was not able to pick up all the stations, so he shut it off. The batteries were low, and to avoid draining them further, Mr. Giragosian did not turn on his radio. The depth finder remained on throughout most of the voyage.

Because Mr. Giragosian intended to operate by dead reckoning from Scituate Harbor to the Bay Point Marina, he did not think he needed the electronic equipment. Moreover, Mr. Giragosian decided to make the trip solely under sail. The winds were light. The day was clear. The seas were calm.

With matters in that posture, the ESCAPE headed out of Scituate Harbor under sail, the small inflatable dinghy behind it. Sailing by the wind is somewhat different than powerboating. Soon after the ESCAPE broke ground, Mr. Giragosian had some difficulty steering her under sail and almost ran aground on a rock jetty. Fortunately, he managed to make a quick tack which prevented this accident. This brief lack of control over the vessel may be inferred to be the result of the fact that most of Mr. Giragosian's sailing in confined areas had been done under power, or at least with the support of power.

With the winds light, Mr. Giragosian sailed northeast out of Scituate Harbor, navigating by compass and dead reckoning. He saw the Tar Pouch gong buoy, passed it, and hove off to the North. Otherwise, despite his intentions to operate by dead reckoning, he did not take any other bearings, or fix his position with reference to any shoreside monuments or promontories. He had not consulted the Notice to Mariners before leaving, and he simply sailed more or less North. In addition, he did not know the emergency frequencies then in existence, including that of the Coast Guard.

Having left Scituate Harbor around 3:00 p.m., he estimated that he was making about six knots. Around 4:30 p.m. his depth finder failed. Later, between 5:00 and 6:00 p.m., well out in greater Boston Harbor, Mr. Giragosian noticed that his floorboards were now covered with sloshing water and that they had begun to float. He checked the bilges and found that they contained approximately four feet of water. It appeared possible to pump the water out manually, and so he and Likely "started to pump like crazy." At this point, the ESCAPE still had sufficient power to operate the navigation lights but only dimly. Mr. Giragosian attempted to go below to get a flashlight but could not find one as the water was now flooding the cockpit and the flashlight was underwater. He tried to use his VHF radio to call for help, but he could raise no one.

Although it was still light at this point, it was getting on towards sunset, and consequently the sea breeze had changed as is normal with the cooling of the afternoon. A slight chop had picked up. Mr. Giragosian and Likely thereupon donned life preservers, retrieved the flare gun, dropped the sails, and hooked up the outboard motor to the inflatable dinghy. They abandoned the ESCAPE and starting toward a drilling rig light which they could see some distance away in the harbor. Their dinghy engine ran out of gas before they ever got to the drilling rig, and so they spent two hours in that very small inflatable dinghy in what they considered rough seas. Actually, although the sea

picked up somewhat with the onset of night, the weather throughout was fair. Finally, they paddled by hand to the rig, where they were rescued after some time by the Coast Guard.

Neither Mr. Giragosian nor Likely saw the ESCAPE go down. The Coast Guard searched for the vessel but was unable to find it.

The Giragosians gave proper notice to Windsor. Before rejecting the claim, Windsor conducted its own search for the vessel. Inferring that the ESCAPE sank, Windsor searched for it with underwater detection devices to see if the vessel could be located on the bottom for possible salvage or at least to confirm that the vessel had in fact sunk.

These efforts were undertaken in good faith and, if not the most extensive possible efforts, were certainly commensurate with the size of the claim and the investment that an insurance company might be expected to make in ascertaining the validity or invalidity of the claim. This search, however, proved fruitless and the ESCAPE was never seen again.

The Court infers from the totality of the record that the water pumped out of the hold of the ESCAPE by the Coast Guard had not actually come down the mast, but rather was the result of a leak in the hull. Just where this leak was cannot be determined on this record but, from what subsequently occurred, the leak was markedly aggravated by attempting to sail the vessel.

Mr. Giragosian, however, was not actually aware that the vessel was leaking at or below the waterline, and he did not know nor did he appreciate that sailing the vessel was aggravating the leak. The Court infers, and thus finds, that water continued to rise in the ESCAPE and that she did in fact sink at some unknown location in Boston Harbor, a total loss. Through no fault of Windsor's search, the vessel is most likely down there but has just not been discovered.

Four issues of law are presented by this factual framework. Three are fairly straightforward, and one is extraordinarily difficult.

■ First, the simplest. At all times, save as mentioned specifically herein, both the Giragosians and Windsor acted in good faith. There is a hint here, never really expressed or fleshed out in argument, that the circumstances necessitating the abandonment of the vessel in calm seas were somewhat questionable; that the fact that the vessel was never located, the fact that no one knows precisely where or how the mechanism of the leak operated so that the ESCAPE could take on four feet of water in two hours, taken altogether, warrants the inference that this is a case of insurance fraud, i.e. that either the vessel was actually spirited off somewhere or that she was sunk and abandoned to obtain the insurance proceeds.

This Court rejects that theory, never really seriously pressed. Given the size of the preferred ship mortgage, and the fact that Mr. Giragosian is still paying the mortgage, it is completely counter-intuitive. He had no motive to destroy the vessel. Indeed, it seems to me farfetched that he would go to such lengths to get rid of the vessel, viz. getting into the small dinghy, then running out of gas, and finally drifting around Boston Harbor. I reject that.

■ The second issue involves alleged misrepresentations in the application for insurance.

There was neither a knowing nor a negligent misrepresentation on the part of Mr. Giragosian in the Skipper Application. He did have ten years of experience in boats, one of which was at least 17 feet in length. There was no material difference in the size of that boat and the 20 foot boat that he mentioned in his application. His answers were in fact honest, and made in good faith. While it is true that the insurance company relied on these answers, they were not materially inaccurate and, if Windsor had wanted to know whether the experience was sporadic or routine, or even the nature of the experience, it could have made inquiry. There is nothing to the claim that the insurance is voided by misrepresentation in the Skipper Application.

Still, Windsor argues that there was an oral misrepresentation relative to the Coast Guard Auxiliary boat owners course, and

supports this argument with the notation made by its agent that Mr. Giragosian was taking the Coast Guard Auxiliary course. The fact that Mr. Giragosian never did actually take the course, however, does not constitute a misrepresentation, for that was his then present intention. *Compare Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass.1990) (Caffrey, J.) ("[the] lack of present intent constitutes a misrepresentation of a material fact"). I find that Mr. Giragosian substituted the training he received from Mr. Menton for this Coast Guard Auxiliary training. Mr. Menton is a qualified boat handling instructor. There was no intent to deceive. Mr. Giragosian was honest with respect to his intentions. Had Windsor wanted more data, it could have asked.

■ Third, there is a doctrine in admiralty law called *uberrimae fidei* which concerns this case. In short, the doctrine of *uberrimae fidei* in admiralty law means utmost fidelity on the part of the insured, which includes notifying the insurer of any sort of data which the insured would understand to constitute a changed condition of material interest to the insurer. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 13 (2nd Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Applying that doctrine to the facts of this case, it would be a stretch to say that Mr. Giragosian complied with any duty of utmost faithfulness to the interests of the insurance company. He did not notify Windsor of the fact that the auxiliary power, the engine power for the vessel, was not working and had not worked since August. Nor did he notify them that the vessel was so low in the water on one occasion that a third party, the Coast Guard, had to come and pump it out. Those are matters having to do with the maintenance of the vessel and were concerns of the ship's owner before putting to sea. These facts would have been material to Windsor. Were the Court to apply the doctrine of *uberrimae fidei* in its full glory, then Mr. Giragosian cannot be considered to have complied with it.

■ In light of the Supreme Court's decision in *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 320–21, 75 S.Ct. 368, 373–75, 99 L.Ed. 337 (1955), however, regarding matters of insurance, the Court rules that the doctrine of *uberrimae fidei* gives way to the state's, in this case the Commonwealth of Massachusetts', interests in regulating the relationship between insurer and insured. In view of the Massachusetts insurance regulatory laws such as Mass.Gen.L. ch. 176D, it is not the admiralty doctrine of *uberrimae fidei* which governs the relationship of the parties here, but rather the insurance contract itself that governs under the law of Massachusetts. *See Prado, Inc. v. Lexington Ins. Co.,* Civ. No. 84–2269–N, 1990 WL 255535, at *10 (D.Mass. June 11, 1990) (Collings, M.J.), *aff'd,* 930 F.2d 906 (1st Cir. 1991).

■ This brings us to the most difficult issue in the case, namely the contract itself and the key warranty that must be construed.

Paragraph 10, the seaworthiness warranty under the General Conditions section of the policy, provides:

Seaworthiness Warranty. Warranted that at the inception of this Policy the vessel shall be in a seaworthy condition and, thereafter, during the term of this Policy, the Assured shall exercise due diligence to maintain the boat in a seaworthy condition.

The particular policy at issue in this case commenced on June 24, 1991. The Court finds that the ESCAPE was in a seaworthy condition as of that date. Therefore, the main question is whether or not, considering the plain language in the warranty, the insureds, Mr. and Mrs. Giragosian, exercised due diligence to maintain the boat in a seaworthy condition during the term of the policy.

Bringing the ESCAPE into Scituate Harbor once her engine had failed exhibited no lack of due diligence. At the time the vessel was brought in, she was in a seaworthy condition, albeit her engine had failed. Nor was there any lack of due diligence in mooring the vessel at what the Court acknowledges is a safe and proper mooring.

Moreover, the Court finds that there was no lack of due diligence stemming from the

fact that the vessel leaked. Many vessels leak. It speaks very highly of the operations of the Coast Guard and the community values of the people in and about Scituate Harbor that someone reported to the Coast Guard that the ESCAPE was lying low in the water, and that the Coast Guard then promptly pumped it out.

■ Turning to the day in question when the ESCAPE was lost: was she seaworthy at the time she left Scituate Harbor? It is a recognized principle of admiralty law, one which is applicable in this case, that the loss of a vessel in a calm sea with no external force imposed upon her, raises a presumption that the vessel is unseaworthy. *P.T. Tugs, Inc. v. United States Fire Ins. Co.,* 796 F.2d 125, 127 (5th Cir.1986) (citing *Boston Ins. Co. v. Dehydrating Process Co.,* 204 F.2d 441, 443 [1st Cir.1953]). Surely the ESCAPE was unseaworthy when she had four feet of water in her hold, her floorboards floating, her electronic gear so weak as to be of no assistance, and any efforts to work the bilge pumps manually failing to outpace the leak. At that point, far from being seaworthy, the ESCAPE was sinking. It was reasonable, indeed, to abandon the vessel at that stage.

■ But still, was the ESCAPE unseaworthy at the time she broke ground and headed out into open water? The Court finds that she was. She was unseaworthy due to a significant defect, namely a leak most likely located in the hull, somewhere at or below the waterline, which was aggravated by the sailing of the vessel. Mr. Giragosian, however, did not know of this latent defect. Under the insurance policy, he had no absolute duty to maintain the boat in a seaworthy condition but rather had to exercise due diligence so to maintain the vessel. *See Jefferson Marine Towing, Inc. v. Underwriters at Lloyd's London,* 472 So.2d 146, 149–50 (La.Ct.App.), *cert. denied,* 475 So.2d 362 (La.1985).

Further analysis is, however, required, for the fact is that when Mr. Giragosian put to sea in the ESCAPE on October 24, 1991 he was, without a doubt, negligent. The objective combination of the facts that he knew that his boat had been sitting so low in the water that the Coast Guard had to pump out the vessel and that he was aware that he had no auxiliary power and that his batteries were so low as to render him unable to contact other vessels if necessary, makes his departure negligent. It does not necessarily follow, however, as matter of law, that the finding of negligence precludes coverage under the policy.

Subjectively, Mr. Giragosian at all times intended to preserve and maintain his vessel and "exercise due diligence to maintain the boat in a seaworthy condition." (Insurance Policy at ¶ 10). Indeed, he was taking it to be hauled out and worked on when this incident occurred.

■ Is this subjective intent enough, though, when by any objective measure of his conduct Mr. Giragosian was negligent? Stated another way, is the "due diligence" required by the insurance policy satisfied under Massachusetts law by conduct subjectively believed by the actor to be adequate to the occasion where such conduct, while not reckless, is in fact negligent? This Court rules that the answer is "yes." Massachusetts insurance law requires that the provisions of insurance policies be interpreted in accord with the justified expectations of the parties. *Worcester Mut. Ins. Co. v. Marnell,* 398 Mass. 240, 245, 496 N.E.2d 158 (1986) (recognizing "the long-standing rule of construction that the favored interpretation of an insurance policy is one which 'best effectuates the main manifested design of the parties'") (quoting *King v. Prudential Ins. Co.,* 359 Mass. 46, 50, 267 N.E.2d 643 [1971] and *Joseph E. Bennett Co. v. Fireman's Fund Ins. Co.,* 344 Mass. 99, 103–04, 181 N.E.2d 557 [1962]); *Town of Ayer v. Imperial Cas. & Indem. Co.,* 418 Mass. 71, 73, 634 N.E.2d 571 (1994). It is common knowledge that protection against liability on the ground of negligence is a primary purpose of indemnity insurance. *Miller v. United States Fidelity & Cas. Co.,* 291 Mass. 445, 448, 197 N.E. 75 (1935). Massachusetts eschews any interpretation which renders indemnification so unlikely as to be illusory. *Liberty Mut. Ins. Co. v. Tabor,* 407 Mass. 354, 358, 553 N.E.2d 909 (1990) ("[a] provision in an insurance policy that negates the very coverage that the policy purports to provide in the circum-

stances where the person is liable is void as against public policy"). *Accord England v. John Hancock Property & Cas. Ins. Co.*, Civ. No. 93–6886, slip op. at 4 (Mass.Sup.Ct. July 18, 1994) (Fremont–Smith, J.); *see also Worcester Mut. Ins. Co. v. Marnell*, 398 Mass. at 245, 496 N.E.2d 158 ("[a]n interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable") (*quoting Sherman v. Employers' Liab. Assurance Corp., Ltd.*, 343 Mass. 354, 357, 178 N.E.2d 864 [1961]). This comprehensive policy purports to extend, *inter alia*, hull insurance [Insurance Policy at Section A], indemnity insurance [Insurance Policy at Section B], medical payments insurance [Insurance Policy at Section D], even longshore and harbor workers' insurance [Insurance Policy at Section C]. Against such a backdrop, it unduly frustrates the Giragosians' justified expectations to void the insurance contract in consequence of an act of simple negligence on the part of the insured. Massachusetts courts would not condone such a result [1] and this Court follows their lead. *Wilburn Boat Co.*, 348 U.S. at 320–21, 75 S.Ct. at 373–75.

For these reasons, the Court declared that Windsor had a contractual duty to indemnify the Giragosians in the amount stipulated as the loss, i.e. $58,000.

On the contract counterclaim, the Court found and ruled that the Giragosians prevail in the amount of $58,000, plus Massachusetts contract interest rates from the day the claim was denied until the counterclaim is satisfied.

On the chapter 93A counterclaim, because the Court interprets the contract as covering this loss—and solely for that reason—the Court ordered judgment for Windsor. On this record, given the negligence of Mr. Giragosian, and the circumstances under which the vessel was lost, there was no unfair or deceptive practice on the part of the insur-

ance company in its marketing the policy in question or in its interpretation thereof. Further, the Court ruled that Windsor's denial of the Giragosians' claim for the loss of the vessel in calm seas in Boston Harbor did not constitute any unfair or deceptive practice nor did it violate either chapter 176D or chapter 93A of the Massachusetts General Laws.

---

1. Indeed, such an interpretation, while possible in view of the "due diligence" warranty, makes this insurance contract so entirely one-sided as to render it "unfair" pursuant to Mass.Gen.L. ch. 93A, § 2(a). *See Schubach v. Household Fin. Corp.*, 375 Mass. 133, 137, 376 N.E.2d 140

(1978) (that commencing small claims action at opposite end of Commonwealth from the defendant's residence is authorized by state venue laws does not preclude finding of unfair violation of Mass.Gen.L. ch. 93A, § 2[a] by such action).