McLEAN HOSPITAL CORP., Plaintiff,

v.

Patricia LASHER, Defendant and Third–Party Plaintiff.

Robert LASHER, Defendant and Third–Party Plaintiff,

v.

DURHAM LIFE INSURANCE CO., Third–Party Defendant.

Civ. A. No. 91–10064–N.

United States District Court, D. Massachusetts.

April 19, 1993.

Kathryn A. O'Leary and Gregory B. Reilly, III, Day, Berry & Howard, Boston, MA, for McLean Hosp. Corp.

William A. Darrin, Jr., Shepard & Darin and Richard A. Simons, George, DeGregorio & Massimiano, Pittsfield, MA, for Patricia Lasher.

M. David Blake and Timothy R. Loff, Blake & Loff, Boston, MA, for Robert Lasher.

Robert A. Sherman, Gaffin & Krattenmaker, P.C. and Paul Michienzie, Gaffin & Krattenmaker, Boston, MA, for Durham Life Ins. Co.

### *ORDER*

DAVID S. NELSON, Senior District Judge.

This matter is before the Court on Third-Party Defendant's motion to dismiss or, in the alternative, for summary judgment (Docket No. 53).

This Court referred the matter to Magistrate Judge Robert B. Collings for review. In a Report and Recommendation ("Report") issued March 31, 1993 (Docket No. 77), Magistrate Judge Collings recommended that this Court deny both motions.

Third-Party Defendant has filed no objection to the Report within the required 10 day period. After a review of Magistrate Judge Collings' Report, this Court **ALLOWS** and **ADOPTS** the findings and recommendations contained therein. Third-Party Defendant's

1. *See* 12/19/91 endorsement on # 40 and Order

motion to dismiss or, in the alternative, for summary judgment is therefore *DENIED.*

### *SO ORDERED.*

### REPORT AND RECOMMENDATION ON THIRD-PARTY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (# 53)

COLLINGS, United States Magistrate Judge.

### I. STATEMENT OF THE CASE

This case involves an action by plaintiff McLean Hospital Corporation (hereinafter "McLean") against the defendants Patricia Simonetta (formerly Patricia Lasher, referred to hereinafter as "Patricia"), and Robert Lasher (hereinafter "Robert"), formerly wife and husband respectively, to recover payment on hospital bills incurred by Robert during his hospitalization at McLean from September to October 1987. The action was originally commenced in Cambridge District Court, and Patricia filed an answer and crossclaim against Robert, who, in turn, filed a counterclaim against Patricia and a third-party action against Durham Life Insurance Co. (hereinafter "Durham"), Robert's health insurer at the time of his hospitalization. Initially, the third-party action alleged state law contractual claims based on the assertion that as Robert's health insurer, Durham was responsible under the policy for payment of the costs of the hospitalization and that Durham's refusal to make payment caused damage to him.

Subsequently, Durham removed the case to federal court. Patricia moved to join in Robert's third-party complaint; the motion was allowed by the court. *See* # 45. Since that time, Robert has been permitted by the Court to amend his third-party complaint on two occasions.[1] The effect of these two amendments was to discontinue Robert's state law causes of action and to substitute a claim under the Employment Retirement Income Securities Act (hereinafter "ERISA").

Durham, pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, has

(# 66) entered May 6, 1992.

filed a Motion to Dismiss the Third Party Complaint, or in the Alternative, for Summary Judgment (# 54) on various grounds.

## II. CONTENTIONS OF THE PARTIES

### A. *Durham's Motion to Dismiss*

Durham seeks dismissal on the grounds that:

(1) Robert's third-party complaint must be dismissed because the state law causes of action alleged are pre-empted by ERISA;

(2) Robert's third-party complaint must be dismissed due to improper/deficient pleading, in that:

(a) it fails to allege that Robert exhausted administrative remedies as required under ERISA, and

(b) it fails to allege sufficient facts to show that the denial of benefits by Durham was arbitrary or capricious.

Robert and Patricia [2] oppose dismissal contending that the third-party complaint was amended subsequent to the filing of the motion so that, at present, the third-party complaint:

(1) no longer alleges any state law causes of action but does properly allege an ERISA claim, and

(2) does allege that Robert's failure to exhaust administrative remedies is excused under ERISA, and

(3) does properly allege that Durham's denial of benefits was arbitrary and capricious.

### B. *Durham's Motion for Summary Judgment*

Durham alternatively seeks summary judgment on the ground that there are no genuine issues of material fact to the extent that:

(1) Robert's claim is barred because he failed to exhaust administrative remedies and cannot show that Durham's denial of benefits was arbitrary or capricious, and

(2) Robert had previously exhausted all benefits available to him under the health insurance policy, and that Durham paid all benefits to which Robert Lasher was entitled, and

(3) Durham's denial of benefits was proper in light of Robert's material misrepresentations on the initial application for insurance, relating to Robert's failure to disclose a pre-existing condition and hospitalization and treatment for substance abuse.

Robert and Patricia oppose summary judgment contending that:

(1) sufficient evidence has been presented to demonstrate that Durham's failure to provide adequate notice of the reasons for denial of benefits and administrative appeal procedures excuses him from the exhaustion requirement, and demonstrates that Durham's denial of the claim was arbitrary and capricious, and

(2) there are genuine issues of material fact on the following issues:

(a) the insurance policy is ambiguous in its terms insofar as the limitation of benefits does not apply to him;

(b) the nature of treatment he received at McLean, i.e. whether he received treatment for drug abuse or for a mental disorder, which issue directly effects the amount of benefits available to him;

(c) that any alleged misrepresentation in failing to disclose prior hospitalization for substance abuse was not intentional but inadvertent, and therefore cannot constitute a valid basis for denial of the claim;

(d) the misrepresentation was not material, since Durham did not rely on any misstatements, as evidenced by its payment of other hospital bills subsequently, thus waiving its right to assert the defense to the claim for the McLean hospitalization; and

(e) in any event, the allegation of misrepresentation is an issue of fact for the jury making summary judgment inappropriate.

---

**2.** For purposes of the analysis, Patricia's opposition will be considered identical to Robert's ex- cept where otherwise noted herein.

### III. STATEMENT OF FACTS

The relevant facts of the case needed to analyze the issues presented are gleaned from not only the stipulation of the parties (# 47) but also supporting affidavits, interrogatories, excerpts from depositions, and exhibits submitted by the parties in support of their contentions.[3] I also consider facts submitted by McLean in connection with its motion for summary judgment.[4] The facts are considered in the light most favorable to Patricia and Robert, the parties opposing Durham's motion.

Robert and Patricia are residents of Pittsfield, Massachusetts. *See* # 47, paras. 1 & 2. At all times material hereto, they were husband and wife, albeit experiencing marital problems and were in the process of divorcing. In 1987, Robert and Patricia were co-owners of a Chinese Take–Out restaurant in Pittsfield, MA, known as Tahiti Takeout, Inc. On or about May 4, 1987, in order to obtain health insurance coverage, Patricia prepared and submitted an application for insurance on behalf of herself, as employee of Tahiti Takeout, Inc., the employer. Robert was listed as a beneficiary/dependent on the application. *See* exhibit attached to # 55.

The application was submitted to United Plans, Inc, which acted as the third-party administrator for Durham Life Insurance Company. *See* # 47, para. 3; Affidavit of Virginia Hodson (# 55), para. 4. The application form contained various questions regarding the health status of the applicants and included questions concerning whether the applicants had undergone any treatment for, or had any known indication of, excessive use of alcohol, narcotics or other drugs, or treatment for any psychiatric illness or mental problems. In response to this question, Patricia answered in the negative, for both herself and Robert.

In response to a question on the application whether the applicants had consulted a doctor or medical practitioner or been a patient in a hospital, clinic, sanitarium or other medical facility within the past five years,

Patricia responded in the affirmative, and in providing additional details as required, stated that Robert underwent a hernia operation in February 1984, *See* # 55, para. 6 and attached exhibit.

The application was signed by Patricia on behalf of both herself and Robert. Above the signature line was a declaration which stated that the applicant provided full and complete and true answers to the questions to the best of her knowledge and that any misstatements, omissions or misrepresentations could result in the rescission of the insurance coverage and a denial of any claims. *See* exhibit to # 55.

The application submitted failed to disclose that in 1983, Robert was treated on an inpatient basis at Brattleboro Hospital for substance abuse. *See* # 55, para. 12. The application also failed to disclose that Robert had any pre-existing problems with substance or drug abuse.

Based on the application submitted, Patricia and Robert became participants or beneficiaries of a health insurance plan, effective June 1, 1987, insured by Durham (Plan certificate # 011–44–4483). There is no dispute that the policy booklet containing the provisions of the health insurance policy controls. *See* # 47, para. 4; # 55, para. 5.

In the summer of 1987, after the policy took effect, Patricia became concerned about Robert's drug abuse problem and suicide threats. This concern followed an incident which she and Robert's sister witnessed during which Robert threatened to commit suicide and she observed needle marks on his arms. At the request of family and friends, Patricia sought to have Robert admitted to two treatment facilities; however,. he was rejected at both due to his high level of toxicity. In August 1987, Robert was admitted to Worcester Ad Care facility but left after a few days.

On September 9, 1987, Patricia, believing she had no other option, appeared in Central Berkshire District Court, along with Robert's

---

**3.** For purposes of deciding the motion to dismiss, the Court relies only on the third-party complaint as amended.

**4.** *See* Report and Recommendation on [Plaintiff's] Motion for Summary Judgment entered March 11, 1993.

father and sister, and testified to Robert's addiction and the belief that he might harm himself and others. Consequently, a writ of apprehension was issued. *See* # 47, para. 5. The following day, September 10, 1987, the Pittsfield Police took Robert into protective custody and brought him to the Central Berkshire District Court. The Court ordered that he be evaluated by the Court psychiatrist, Dr. Gardner. Upon evaluation, Dr. Gardner determined that Robert was suicidal, and he suggested Robert be placed in a secure psychiatric facility.

Patricia, together with family, friends and the Family Forensic Services Office in Pittsfield and other court personnel, attempted to find an appropriate placement for Robert. Toward the end of that day, the social worker for Berkshire Mental Health advised that officials at McLean Hospital had been contacted and agreed to Robert's commitment to McLean.

As a result, it was arranged for an ambulance to pick Robert up at the courthouse. The ambulance transported him to McLean where he was committed, against his will.[5] Robert remained hospitalized at McLean from September 10, 1987 until October 8, 1987. *See* # 47, para. 6.

On September 15, 1987, one day before the initial commitment order was to expire, McLean petitioned the Court for an order committing Robert for an additional six months. The matter was taken under advisement pending an independent psychiatric evaluation. Based on that evaluation, the Court ordered Robert be discharged outright, *see* # 47, para. 7, since he was found not to be acutely suicidal at that time. Further treatment was recommended by McLean. The bill for McLean's services, supplies, etc. provided to Robert during his hospitalization totalled $14,282.37. *See* # 47, para. 8.

A year later, i.e., from October 17, 1988 to November 16, 1988, Robert was hospitalized at the Charter Peachford Hospital in Atlanta, Georgia (hereinafter "Charter Peachford") for treatment for drug abuse. The total cost of this hospitalization was $13,696.35. *See* # 55, paras. 8 & 9.

By letter dated November 8, 1988, Robert's counsel, M. David Blake, Esquire, advised Durham that Robert had elected this treatment at Charter Peachford and that Durham was then authorized to make payment to Charter Peachford pursuant to the benefits available under the policy. *See* # 47, para. 10 and Exh. C. attached.

Durham subsequently paid $10,000 toward the Charter Peachford bill. *See* # 47, para. 11. The $10,000 represented the total lifetime benefits available under Robert's policy since the policy contained a $10,000 maximum lifetime benefit for treatment for drug abuse. *See* # 47, exh. B, p. 48. There is a dispute as to whether this lifetime limit is applicable in the present case.

Subsequently, McLean filed suit against Patricia and Robert to recover for the charges associated with Robert's hospitalization in 1987. A claim was made by Patricia and Robert to Durham for payment by Durham of the bill from McLean. At various times, the claim was denied by Durham for various reasons.

Initially, Durham denied the claim on the ground that the McLean hospitalization was for a pre-existing condition of Robert's. After further inquiry by Patricia, and further review by Durham, Durham withdrew its denial based on that ground and denied the claim on the ground that Robert had exhausted all benefits to which he was entitled under the policy in light of the $10,000 payment to Charter Peachford. Durham also denied the claim on the ground that the hospitalization was court-ordered. Neither Robert nor Patricia pursued any administrative appeals of Durham's denial of the claim.

Subsequently, Durham denied the claim on the ground that Patricia and Robert materially misrepresented facts on the application for insurance by failing to disclose Robert's drug abuse and/or mental illness problems as well as failing to disclose Robert's hospitalization for drug abuse at Brattleboro Hospital.

---

5. He was actually committed by the court to the Department of Mental Health.

## IV. ISSUES PRESENTED

1. Whether Robert's third-party complaint against Durham should be dismissed due to pre-emption of the state law claims by ERISA;

2. Whether Robert's third-party complaint against Durham should be dismissed due to improper or deficient pleading in the complaint with respect to the failure to allege facts showing the exhaustion of administrative procedures and to allege Durham's arbitrary and/or capricious conduct in denying the review;

3. Whether Durham is entitled to summary judgment in light of the fact that Robert did not exhaust administrative remedies, or whether Robert is excused from such requirement, as being futile, due to the deficiency of notice of denial from Durham and lack of notice of the availability of an appeal;

4. Whether Durham is entitled to summary judgment because, under the arbitrary and capricious standard of review, Durham acted reasonably in denying the claim, or whether Robert has provided sufficient evidence that, in the court's discretion, Durham's denial of benefits was improper due to the reasons for denial, and the lack of adequate notice of denial;

5. Whether Durham is entitled to summary judgment in light of Durham's payment of $10,000 toward the Charter Peachford Hospital bill which it claims constitutes full payment of the entire lifetime benefit to which Robert is entitled under the policy, or whether Robert has raised a genuine issue of material fact as to the nature of his treatment and the corresponding amount of benefits still available to him under the terms of the policy;

6. Whether Durham is entitled to summary judgment due to Patricia's and Robert's misrepresentations on the application for insurance as to pre-existing conditions and prior hospitalization, or whether there is a genuine issue as to whether the misrepresentations were intentional and whether they were "material."

## V. ANALYSIS

### A. Durham's Motion to Dismiss

It should be noted that the two basic arguments set forth by Durham in support of dismissal have become moot since the motion was filed in view of this Court's Order (# 66) issued May 6, 1992 which granted Robert leave to amend further his amended third-party complaint (# 67).[6] Additionally, this court's allowance of Patricia's Motion, Etc. (# 45) to join Robert as a third-party plaintiff pursuant to Rule 20(a), Fed.R.Civ.P., make some of Durham's contentions moot as well.[7] Therefore, the arguments set forth by Dur-

---

6. Much of Durham's arguments in connection with its motion to dismiss relate to Robert's original third-party complaint which contained only state law causes of action and the amended third-party complaint (# 57) which adds an ERISA claim.

   However, this Court allowed Robert's motion to amend the third-party complaint (# 40) at a Rule 16(b) conference and motions hearing, held on December 19, 1991, at which time counsel for Durham was present. The Amended Complaint (# 57, filed November 27, 1991), merely added a single paragraph as follows:

   8. This claim by Third Party Plaintiff [Robert Lasher] against Third Party Defendant arises under ERISA section 502(a)(1)(B) whereby a civil action can be brought by a beneficiary to recover benefits due to him under the terms of a health insurance plan. Furthermore, the District Court for the District of

Massachusetts has exclusive jurisdiction over this claim pursuant to ERISA section 502(f).
   On May 6, 1992, this Court allowed Robert to again amend the third-party complaint (# 67, filed May 6, 1992). The Court presumes that the third-party complaint as amended after the May 6th filing is the controlling pleading.

7. Although Durham objects to Patricia's motion to join in Robert's ERISA claim, it has asserted that it intends to address this issue in its motion for summary judgment. See # 51. This Court had previously allowed this motion at a Rule 16(b) conference and motions hearing held on December 19, 1991 at which counsel for Durham was present. However, the Court recognizes that any claims by Patricia against Durham are only as viable as Robert's claims against Durham, and to this extent, the court will consider the arguments set forth by both Robert and Patricia interchangeably, except as otherwise noted.

ham need not be discussed at great length here.

First, the operative pleading (# 67) entitled "Amended Third Party Complaint" contains only an ERISA claim; no state causes of action are made. In sum, the third-party plaintiffs have recognized the preemptive force of ERISA and have conformed their operative pleading accordingly.

■ Second, the third-party plaintiffs have also alleged in the operative pleading (# 67):

9. The Third–Party Plaintiff is not required to exhaust administrative remedies prior to seeking relief under ERISA due to lack of notice to him regarding the reasons for denying his claim and the proper review procedures available to him.

10. The Third–Party Plaintiff alleges that the Third–Party Defendant's denial of the claim at issue was arbitrary and capricious due to lack of notice, and the Third–Party's self-interest in denying the claim.

Thus, Durham's claims of insufficiency of the pleadings for failure to make those allegations are now moot. Although Robert does not allege that he has exhausted administrative remedies or that exhaustion would be futile, his allegations are a sufficient assertion that he is excused from the exhaustion requirement due to Durham's failure to provide proper notice of the denial, the reasons therefor, and steps to appeal the decision. *See DePina v. General Dynamics Corp.,* 674 F.Supp. 46 (D.Mass. 1987) (Young, J.) (holding that deficiency in denial notice and failure to advise of review procedures was factor which excused plaintiff from resorting to administrative procedures prior to federal suit). *See also Curry v. Contract Fabrications, Inc. Profit Sharing Plan,* 891 F.2d 842 (11 Cir. 1990). Thus, the failure to plead expressly that exhaustion would be "futile" does not render the pleading insufficient.

Lastly, it is noted that the operative pleading now contains allegations that Durham's denial was "arbitrary and capricious," although there is some question as to whether this is the proper standard of review after the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also Burham v. Guardian Life Insurance Co.,* 873 F.2d 486 (1 Cir. 1989); *Ring v. Confederation Life Insurance Co.,* 751 F.Supp. 296, 298–9 (D.Mass. 1990). Whether the "arbitrary and capricious" standard or a *de novo* standard is to be applied depends on whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch, supra,* 489 U.S. at 115, 109 S.Ct. at 956. If the answer is in the affirmative, the "arbitrary and capricious" standard applies; if not, the standard is a *de novo* review. *See also Jader v. Principal Mutual Life Ins. Co.,* 723 F.Supp. 1338, 1340–1 (D.Minn. 1989). However, this issue need not be determined in order to rule on Durham's motion for to dismiss.

Accordingly, I shall recommend that Durham's motion, to the extent that it seeks a dismissal of the third-party claims, be denied.

B. *Durham's Motion for Summary Judgment*

1. **Failure to Exhaust Administrative Remedies**

a. The Facts and the Parties' Contentions

Despite the fact that Robert has now adequately plead excusal from exhaustion of administrative remedies, Durham contends that even on the facts construed most favorably to him, there is insufficient evidence upon which excusal can be found.

There is no dispute of fact in this case that, although inquiry was made as to the reasons for denial of the claim, neither Patricia nor Robert sought any administrative review of the denial of the claim by Durham.[8]

Robert claims that he is not required to exhaust all administrative remedies prior to seeking relief under ERISA due to the lack of notice to him regarding the reasons for denying his claim, and the proper review procedures available to him, and further, that the denial of benefits by Durham was arbitrary, capricious and in bad faith, motivated by Durham's self-interest.

---

8. The extent of the communications concerning the denials will be discussed, *infra.*

First, Robert alleges that ERISA does not speak directly as to whether exhaustion of administrative remedies is a prerequisite to bringing suit, and that this issue is left to the discretion of the trial court. In support of this contention, he cites *Janowski v. Local 710 Pension Fund, Intern. Brotherhood of Teamsters,* 673 F.2d 931 (7 Cir. 1982) and *Curry v. Contract Fabricators, Inc. Profit Sharing Plan,* 891 F.2d 842 (11 Cir. 1990). Robert asserts that the inference which should be drawn from the record is that any administrative review would have been "futile" in light of Durham's failure to advise and notify him of the appropriate review procedures in accordance with ERISA. Thus, he contends, Durham is not entitled to summary judgment.

Section 1133 of ERISA provides, in pertinent part:

... every employee benefit plan shall—
(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by a participant and
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

Additionally, the regulations which are promulgated by the Secretary of Labor to implement the statute provide that the plan administrator shall provide written notice to every claimant who is denied benefits, and the written notice is to contain the following information:

(1) the specific reason or reasons for the denial;
(2) specific reference to pertinent plan provisions on which the denial is based;
(3) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f) (1980).

■ Courts have held that letters which contain only "conclusory" reasons for denial fail to indicate information needed to appeal, provide only sparse information as to procedures for review and lack notice of appeal rights are deemed insufficient and do not comply with section 1133. *Wolfe v. J.C. Penny Co.,* 710 F.2d 388, 392 (7 Cir. 1983); *Tomczyscyn v. Teamsters Local 115,* 590 F.Supp. 211, 215 (E.D.Pa. 1984); *DePina v. General Dynamics Corp., supra,* 674 F.Supp. at 50. Moreover, inadequate notice, in and of itself, may constitute arbitrary and capricious denial of benefits. *Jader v. Principal Mutual Life Ins. Co., supra,* 723 F.Supp. at 1341.

In the present case, Robert claims that actual notice of the denial of the claim was apparently sent to his (now ex-)wife Patricia. He claims that three separate notices of denial were sent to Patricia, and that none of the notices set forth any review procedures. Further, he contends that the first two notices indicated an incorrect reason for denial. The third notice changed the bases upon which Durham denied the claim but still lacked the requisite information. Robert claims the third notice was dated subsequent to his impleading of Durham as a third-party defendant when this case was still in state court. *See #* 62, p. 2. Further, in his affidavit,[9] Robert avers that he has received no direct written notice of any denial of his claim (paragraph 6), nor any notice of his rights of appeal or review. (paragraph 7).

In her affidavit submitted in opposition to Durham's motion,[10] Patricia asserts that the first response she received from Durham respecting a claim for payment for Robert's hospitalization at McLean was on April 25, 1990. *See #* 61, para. 5. The April 25, 1990 letter from Durham advised that Durham was denying the claim because Robert's

---

**9.** The Affidavit of Defendant Robert Lasher is an attachment to # 62.

**10.** Affidavit of Patricia (Lasher) Simonetta (# 61).

treatment at McLean was for a pre-existing condition. *See* # 68, exh. A. The letter read as follows:

Dear Mr. Darrin: [11]

Per your request, Mr. Lasher's file has been reviewed regarding the action taken on his bills from McLean and Peachford Hospitals.

McLean Hospital bill of Spetember (sic) 10, 1987 to October. 16, 1987 in the amount of $13,523.00 was denied due to a pre-existing condition. A pre-existing condition is defined as an illness or injury for which a covered person received medical care or treatment prior to the effective date of insurance. Injury or illness includes conditions or symptoms which were present and manifest prior to the effective date of insurance. This exclusion will end after one year from the effective date or twelve months treatment free whichever comes first.

Peachford Hospital bill of October 17, 1988 to November 16, 1988 was paid the policy maximum of $10,000.00 on August 16, 1989. If you have any further questions, please do not hesitate to call me.

Sincerely,

Patricia Girvan

Claims Manager

It should be noted that the letter contains no identification of the pre-existing condition upon which Durham was relying; however, the point is immaterial since Durham does not now contend that the exclusion does in fact apply.

The April 25th letter prompted further inquiries by Patricia. The nature of the inquiry is unclear but a letter from Durham to her dated December 4, 1990, *see* # 68, exh. B, states that it is written in response to Patricia's "inquiry." The letter reads as follows:

DECEMBER 4, 1990

RE: INSURED: PATRICIA A. SIMONETTA

PATIENT: ROBERT A. LASHER

CLAIM #: 65337–0001–1–0001

DEAR MRS. LASHER,

PLEASE BE ADVISED THAT WE HAVE RECEIVED YOUR INQUIRY AS TO OUR DENIAL OF THE MCLEAN'S HOSPITAL CHARGES AND APOLOGIZE FOR THE DELAY IN RESPONDING.

AFTER REVIEWING OUR FILE WE FIND THAT AN ERROR ON OUR PART WAS MADE BY DENYING THE CHARGES AS PRE–EXISTING; HOWEVER THESE CHARGES WOULD HAVE BEEN INELIGIBLE DUE TO THE FACT THE ATTORNEY STATES THIS STAY WAS COURT ORDERED WHICH WE DO NOT COVER. ALSO, YOUR HUSBAND HA, (SIC) SATISFIED HIS LIFETIME MAXIMUM BENEFIT FOR THIS TYPE OF TREATMENT WITH THE CHARTER PEACHFORD IN–PATIENT STAY. SHOULD YOU HAVE ANY ADDITIONAL QUESTIONS PLEASE DO NOT HESITATE TO CONTACT ME AT THE NUMBER LISTED ON THE BOTTOM OF THIS LETTER.

SINCERELY,

LISA SANTOSPASO

CLAIMS DEPARTMENT

In sum, in the letter, Durham advises that the denial based on a pre-existing condition was erroneous. However, the claim is denied because Robert would have been ineligible for coverage due to the fact that "the attorney states this stay was court ordered which we do not cover." No citation to the exclusion provision of the policy which would support this contention is referenced. Moreover, Durham alleged an additional basis for denial—i.e., that Robert had received his maximum lifetime benefit under the policy as a result of the Charter Peachford in-patient stay.[12]

According to Patricia, after receipt of the December 4, 1990 letter, she informed Durham that the denial was in error in that the treatment was not court-ordered in lieu of a criminal conviction. *See* # 61, para. 6. She

---

11. Mr. Darrin was Patricia's attorney at the time.

12. This issue is contested by the parties, and will be discussed in further detail, *infra*.

further contends that Durham never informed her of any rights to appeal its denial of this claim. *See* # 61, para. 7.

With regard to Durham's $10,000.00 payment to Charter Peachford Hospital in Atlanta, Georgia (from October 17, 1988 to November 16, 1988) which provides an additional basis for Durham's denial of the McLean's bill claim, Patricia asserts that she never authorized Durham to pay that bill and repeatedly requested that Durham pay the hospital bill from McLean. *See* # 61, para. 9. However, it is not disputed that Robert did authorize the payment to the Charter Peachford Hospital.

Finally, according to Patricia, well after June 1, 1989, Durham communicated to her its intention to deny the claim on yet another ground. Durham contends that it has no obligation to pay any benefits insofar as there was an alleged material omission on the application for insurance respecting Robert. *See* # 61, para. 8. It is unclear whether this reason was memorialized in a writing to Patricia but Durham presses this basis for denying the claim. Specifically, Durham alleges that Patricia, in completing the application for health benefits on behalf of Robert, answered in the negative to a question asking whether either she or Robert had ever been treated for, or ever had any known indication of excessive use of alcohol, narcotics or other drugs, or had consultation or treatment, therapy or counseling for psychiatric illness or problems relating to personality or mental state. *See* # 47, exh. A. Additionally, Durham asserts that, in response to the question whether either had consulted a doctor or medical practitioner or been a patient in a hospital, clinic, sanitarium or other medical facility within the past 5 years, Patricia failed to disclose that Robert had been hospitalized in 1983 at the Brattleboro Retreat Hospital for substance abuse. *See* # 47, exh. A.

Patricia and Robert assert a number of defenses to these contentions, and this issue of misrepresentation will be discussed in detail, *infra.*

### b. Legal Analysis

The recitations in the parties' submissions in connection with Durham's motion for summary judgment on the exhaustion issue provide little assistance to the Court in resolving the issues presented. The briefs fail to include an adequate review of the law regarding the application of the exhaustion doctrine under ERISA as interpreted by district judges in this District. In fact, much of the case law cited by the parties focuses on decisions which have been rejected or modified by district judges in Massachusetts. However, The Court's review of the case law from this District concerning the exhaustion doctrine provides substantial guidance in resolving the conflict, and a discussion of the doctrine in some detail is warranted.[13]

It should first be noted that, by its own terms, ERISA does not expressly require all claimants to exhaust administrative remedies prior to suit in federal court. However, the exhaustion doctrine has been well established under case law. *See e.g. Kross v. Western Electric Co.,* 701 F.2d 1238, 1243–5 (7 Cir. 1983); *Amato v. Bernard,* 618 F.2d 559, 567–8 (9 Cir. 1980); *DeLisi v. United Parcel Service, Inc.,* 580 F.Supp. 1572, 1575–6 (W.D.Pa. 1984); *King v. James River–Pepperell, Inc.,* 592 F.Supp. 54, 55–6 (D.Mass. 1984) (modified by *Treadwell v. John Hancock Mutual Life Insurance Co.,* 666 F.Supp. 278, 283 (D.Mass. 1987)); *Janowski v. Local 710 Pension Fund, Intern. Brotherhood of Teamsters, supra,* 673 F.2d at 935.

There are several public policy reasons underlying the exhaustion doctrine. These reasons were set forth in detail in *Amato v. Bernard, supra,* 618 F.2d at 567–8, and reiterated in *Kross v. Western Electric Company, Inc., supra,* 701 F.2d at 1244–5. These include:

(1) to reduce frivolous lawsuits under ERISA;

(2) to promote consistent and uniform treatment of claims and benefits;

(3) to provide a nonadversarial method of claims settlement, and to encourage pri-

---

**13.** There is no First Circuit law directly on point, but there are several District Court cases from the District of Massachusetts which touch upon the issues presented here and which will be discussed.

vate resolution of ERISA related disputes, *King v. James River–Pepperell, Inc., supra,* 592 F.Supp. at 55–6, *modified on other grounds,* 593 F.Supp. 1344 (D.Mass. 1984);

(4) to minimize the cost of claims settlement for all parties involved;

(5) to foster the intent of Congress and the Secretary in establishing administrative remedial procedures which were to be regularly used by aggrieved claimants, *see Drinkwater v. Metropolitan Life Insurance Co.,* 846 F.2d 821, 825 (1 Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *Kross v. Western Electric Company, Inc., supra,* 701 F.2d at 1244–5; and, perhaps most important,

(6) that prior considered actions by plan trustees or administrators interpreting their plans, refining and defining problems in cases, may well assist the courts in resolving the controversies eventually litigated. *Id.* at 1245. *See also Mason v. Continental Group, Inc.,* 763 F.2d 1219, 1227 (11 Cir.1985), *cert. denied,* 474 U.S. 1087 [106 S.Ct. 863, 88 L.Ed.2d 902] (1986).

The underlying rationale for the last reason is that the plan trustee or arbitrator may be able to prevent premature judicial intervention in the decision-making process by applying some expertise in interpreting the provisions of the plan and in the carrying out of the fiduciary duties. *Treadwell v. John Hancock Mutual Life Insurance Co., supra,* 666 F.Supp. at 284. Despite these reasons based on policy, courts have carved out exceptions to the exhaustion requirement. A review of the exhaustion doctrine and its exceptions was explored by the court in the *Treadwell* case. In that case, Judge Caffrey traced the history of the doctrine, noting that the circuits are split as to whether exhaustion of internal plan remedies is a pre-requisite to bringing a claim under ERISA in federal court. *Id.* at 284 citing *Mason v. Continental Group, Inc., supra* and noting the dissents from the denial of certiorari by Justice White, 474 U.S. at 1087, 106 S.Ct. at 864 ("the conflict among the circuits over the issue of an exhaustion requirement under ERISA can hardly be passed over as an unimportant one, unworthy of this court's attention").

The split involves a distinction between "statute-based" and "plan-based" claims. In applying the exhaustion doctrine, both the Third and Ninth Circuits apply this distinction. *Zipf v. American Telephone and Telegraph Co.,* 799 F.2d 889, 891–3 (3 Cir.1986); *Amaro v. Continental Can Co.,* 724 F.2d 747, 751–2 (9 Cir.1984). Plan-based claims, such as a claim for benefits, are those which arise under the terms of the specific plan, and are contractual in nature. Plan-based claims are barred from federal suit unless exhaustion of administrative remedies or intra-plan remedies has occurred prior to suit. Statute-based claims, such as a claim for wrongful discharge/forced retirement (a violation of the wrongful discharge provision in section 510 of ERISA) relate to rights which are afforded claimants by Congress.

The rationale underlying the distinction is that plan-based claims relate merely to contractual interpretation, which can best be left to an administrator or trustee to resolve while a statute-based claim is considered to be a matter of statutory interpretation and application is therefore more appropriate for judicial determination. *Treadwell v. John Hancock Mutual Life Insurance Co., supra,* 666 F.Supp. at 284. Another reason for the distinction is that Congress assigned to plan fiduciaries the primary responsibility for evaluating claims for benefits but has not done so for statute-based claims. *Id.* at 283 citing *Zipf v. American Telephone and Telegraph Co., supra,* 799 F.2d at 892–893.

The Court in *Treadwell* adopted the view of the Third and Ninth Circuits, holding that there is a logical distinction between plan-based and statute-based claims, and that the exhaustion rule above mentioned applies only to plan-based claims. On the other hand, there is no requirement of exhaustion of remedies prior to bringing a statute-based claim. *See Amaro v. Continental Can Co., supra,* 724 F.2d at 751–2; *Zipf v. American Telephone and Telegraph Co., supra,* 799 F.2d at 891–3. This view is in conflict with holdings of the Seventh and Eleventh Circuits which do not draw the distinction between plan-based and statute-based claims.

These Circuits have held that the exhaustion doctrine applies to *both* plan-based and statute-based claims. *Kross v. Western Electric Co., supra*, 701 F.2d at 1245, modified by *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 466 (7 Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987).

██ However, the conflict is only of academic interest with respect to the instant case since Robert is making a claim under ERISA for benefits under a specific health insurance plan, and therefore, his claim falls within the "plan-based" category which requires exhaustion of administrative remedies prior to suit in federal court, unless the facts indicate that Robert falls within a recognized exception to the exhaustion rule.

██ This District Court has recognized that there are exceptions to the exhaustion requirement. These exceptions are delineated as follows: (1) when resort to administrative procedures would be futile, *DePina v. General Dynamics Corp., supra*, 674 F.Supp. at 49, or the remedy inadequate, *Ring v. Confederation Life Ins. Co.*, 751 F.Supp. 296, 297 (D.Mass.1990) citing *Drinkwater v. Metropolitan Life Ins. Co., supra*, 846 F.2d at 825; *see Giuffre v. Delta Air Lines, Inc.*, 746 F.Supp. 238, 240 (D.Mass.1990) (also citing *Drinkwater*); (2) if the claimant would suffer irreparable harm, *DePina v. General Dynamics Corp., supra*, 674 F.Supp. at 49; or (3) if the claimant is wrongfully denied meaningful access to the procedures. *DePina v. General Dynamics Corp., supra*, 674 F.Supp. at 49 citing *Lieske v. Morlock*, 570 F.Supp. 1426, 1429 (N.D.Ill.1983). It is clear that for any exception to apply, the plaintiff has the burden of asserting facts to support the claimed exception. *See Giuffre v. Delta Air Lines, Inc., supra*, 746 F.Supp. at 240 (where futility claim not supported by evidence, summary judgment granted against claimant).

In the present case, Robert asserts he is excused from the exhaustion requirement due to the "futility" of pursuing administrative procedures and because of the lack of notice to him of his appeal rights and the reasons for denial of the claim. In the *DePina* case, which is factually analogous to the present case, Judge Young held that proce-dural deficiencies in the notice of denial and the attending futility of any further review excused a claimant from the exhaustion rule. In that case, DePina was an employee of General Dynamics Corporation for eight years. In his suit, he sought reimbursement under an employee benefit plan for hospital expenses incurred in October to November 1984. On June 26, 1983, DePina had been involved in an automobile accident in which another individual died; he was found to have been driving under the influence of alcohol at the time of the accident. Subsequent judicial proceedings resulted in an order that he undergo treatment for his alcoholism. After a preliminary confirmation of his insurance coverage for the treatment with personnel at General Dynamics, DePina entered the Beach Hill Treatment Center in October 1984 for several weeks. The admitting physician described DePina as a "binge alcoholic". *DePina v. General Dynamics Corp., supra*, 674 F.Supp. at 48.

On November 20, 1984, DePina submitted a claim to the plan for payment of $3,892.92, the amount of the hospital bill. General Dynamics denied the claim because (1) the hospitalization was not at the recommendation of a physician but was "court ordered"; and (2) DePina did not enter the hospital due to any alcohol "sickness" as defined under the plan. Later General Dynamics claimed that the denial of the claim was based upon its policy for not reimbursing its employees for any expenses in lieu of incarceration. *DePina v. General Dynamics Corp., supra*, 674 F.Supp. at 48.

On April 3, 1985, DePina received a written notice of the denial of his claim.

The notice consisted of an "explanation of benefits" form which is a preprinted form with DePina's name, address, claim number, charges submitted and benefits payable typed in. Typed in the bottom in bold capitals was "This service is not covered by your medical plan." On the reverse side, in small print, the basic appeal procedure is set out, although no address or telephone number is provided to enable an

appellant to contact the proper person before whom an appeal is to be brought. *Id.*

After receipt, DePina obtained counsel who attempted to resolve the claim but was unable to do so. DePina brought suit in Quincy District Court; the suit was removed to federal court. It was undisputed that DePina never followed any appeal procedures listed either in the plan booklet given to employees or listed on the notice of denial. · *Id.*

General Dynamics moved to dismiss the action, or for an entry of summary judgment, on the grounds that DePina failed to exhaust administrative remedies (and the appeal period had expired). DePina argued that any resort to further procedures would have been futile and the actions of General Dynamics were arbitrary and in violation of ERISA.

As noted previously, section 1133 of ERISA provides that every benefit plan shall provide adequate notice to a claimant denied benefits, setting forth the specific reasons for denial, written in a manner calculated to be understood by a claimant and that the notice must afford a reasonable opportunity to any claimant for a full and fair review of the denial of the claim. *See also* regulations set for in 29 CFR 2560.503–1(f) (1980) discussed *supra* at pp. 119–120.

In *DePina*, the Court found that the letter General Dynamics sent failed to meet these requirements because specific reasons for the denial were not given, the letter failed to refer to specific provisions of the plan upon which the denial was based, and, while mentioning steps which could be taken for a review of the denial, the letter failed to provide an address or telephone number of the person to contact in order to pursue a review.[14] *DePina v. General Dynamics Corp., supra,* 674 F.Supp. at 50 citing *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 392 (7 Cir.1983) (" 'conclusory' reason for denial, failure to indicate information needed to appeal, and frugal information as to review procedure amounted to a violation of section 1133") and *Tomczyscyn v. Teamsters Local 115, supra,* 590 F.Supp. at 215 ("defendant's letter defi-

cient as a matter of law due to failure to include notice of appeal rights").

Moreover, the Court in *DePina* rejected General Dynamic's argument that the deficiencies in the letter were immaterial due to the fact that DePina had retained counsel within the time when an appeal could have been taken. Judge Young wrote:

> This court rejects that proposition [put forth by General Dynamics] for the same reason it was rejected by the court in *Tomczyscyn*. "That [plaintiff was] represented by counsel does not require a different result; nothing in the regulations suggests that its application is limited to cases in which claimants have no other means of learning their right to appeal."

*DePina v. General Dynamics Corp., supra,* 674 F.Supp. at 50 quoting from *Tomczyscyn v. Teamsters Local 115, supra,* 590 F.Supp. at 214.

As a result of these findings, the Court refused to dismiss or remand DePina's claim for failure to exhaust, writing:

> Where, as here, the record is complete, there is no hint of a frivolous claim and the Plan's policies are well known already, those purposes are not effectuated by a remand. Concomitantly, here such action would cause DePina to expend needless resources for what appears to be a certain denial of his appeal. General Dynamics has made it apparent throughout this litigation that it intends to refuse any further claim by DePina, and that its refusal is consistent with its longstanding policy of denying any claims for reimbursement for hospitalization in lieu of incarceration. The futility exception is particularly appropriate where the past pattern of an agency or administrator as well as its position on the merits of the current matter in litigation reveal that any further administrative review would provide no relief. (citation omitted)

*DePina v. General Dynamics Corp., supra,* 674 F.Supp. at 50–1.

The holding in *DePina* was followed in the case of the *Ring v. Confederation Life Ins.*

---

14. The Court in *DePina* also noted the letter failed to comport with its own procedures outlined in the Plan booklet requiring the notice to set forth the reasons for the denial.

*Co., supra,* 751 F.Supp. 296, wherein the Court held insufficient notice excused the claimant from the exhaustion requirement. In that case, Ms. Ring, an employee of Stop & Shop who suffered a back injury at work on March 4, 1985, sought disability benefits under an ERISA plan. She received benefits through April 21, 1988. At that time the insurance company administering the plan sent her a letter terminating benefits because they claimed she was no longer disabled and that she had a job offer which two physicians advised was compatible with her physical abilities. The letter also advised that Ms. Ring could have the denial of further benefits reviewed, and questions answered, by writing to them within 60 days. Within that time frame, Ms. Ring submitted a letter requesting a review. The insurer sent a second letter in February 1989 which stated that after further investigation, due to lack of further medical information, the decision denying benefits remained the same as previously stated. The company stated that if Ms. Ring wanted to submit further medical information, the company would be "happy to review it". She never filed a request for review. *Id.* at 296–7.

In rejecting the argument that Ms. Ring was barred from bringing the claim for failure to exhaust administrative remedies, the Court wrote:

> Even if the second notification were deemed to mark the decision from which Ms. Ring was required to request a review, the [second] letter ... did not adequately notify Ms. Ring of the requirement. *DePina v. General Dynamics Corp.,* 674 F.Supp. 46 (D.Mass.1987). Ms. Ring has exhausted all required administrative procedures and has permissibly brought suit in federal court.

*Ring v. Confederation Life Ins. Co., supra,* 751 F.Supp. at 297–8.

Thus, the court deemed Ms. Ring's initial inquiry to be sufficient to satisfy the exhaustion rule, even though no official procedures were followed.

The instant case is an even stronger case for the claimants than either the *DePina* and *Ring* cases were. The notices sent to Patricia Lasher Simonetta [on behalf of Robert Lasher] were clearly insufficient and violative of ERISA regulations. A plain reading of the letters leaves no room for dispute. No review or appeal rights are mentioned in the letter. Moreover, the evidence presented by Patricia and Robert raises genuine issues of material fact as to whether they knew of any appeal procedures available to them. As in *DePina,* the fact that counsel was obtained during the course of litigation is immaterial to the obligations clearly imposed onto Durham under the law. Under the *DePina* rationale, Patricia and Robert have clearly raised sufficient evidence of inadequate notice so as to support their claim that an exception to the exhaustion rule is applicable in their case.

Moreover, the fact that Durham cited several varying reasons for the denial (i.e., pre-existing condition, prior exhaustion of full benefits, hospitalization was in lieu of incarceration/court ordered, and material misrepresentation) would tend to indicate that had Patricia or Robert pursued any administrative review, the outcome would have been no different.

I do not see a remand so as to permit exhaustion as advancing matters. *DePina v. General Dynamics Corp., supra,* 674 F.Supp. at 51. It is clear that Patricia and Robert's claim is not frivolous, and it is equally clear that, given Durham's past and current position on the merits of the claim, any administrative review at this time would be futile.

Therefore, I shall recommend that Durham's motion for summary judgment on the grounds that the Lashers failed to exhaust administrative remedies prior to bringing suit in federal court serves as a bar to the action be denied.

### 2. Exhaustion of Benefits Available Under the Policy

Even if Robert is excused from the requirement that he exhaust administrative remedies, Durham contends that it is entitled to summary judgment on the grounds that it acted properly in denying the claim in that there is no genuine issue of material fact underlying the proposition Robert received the total lifetime benefits to which he was entitled under the policy. The predicate for

this argument is that Durham paid $10,-000.00 to Charter Peachford Hospital for Robert's treatment for drug abuse. *See* # 47, para. 11; # 55, paras. 8 & 9. Durham claims that under the terms of the policy, and specifically in the Rider to the policy (page 48) Robert was only entitled to receive a maximum lifetime benefit of $10,000.00 for treatment for drug abuse. *See* # 47, exh. B, p., 48.

The parties have stipulated that the policy controls and that the Rider is included in the policy. *See* # 47, para. 4; *see also Bluewaters, Inc. v. Boag*, 320 F.2d 833 (1 Cir.1963) (insurance policy and Rider constitute single agreement). Although it is not explicitly mentioned by any party as to the date upon which the Rider became effective, it is presumed that the Rider was issued simultaneously with the Group policy, effective June 1, 1987, since it appears to have been particularized for the state in which the insureds reside. *See* # 47, para. 4, # 55, para. 5. The Rider itself also states "the provisions of the rider apply on the effective date of any insured person whose primary residence is in the state of Massachusetts."

The original Group policy contained a provision dealing with limitations of benefits for certain types of illness. Form G1380.3–5 (3781–6) of the Group policy states, in pertinent part:

2. For care or treatment, whether inpatient or outpatient, of nervous and mental disorders, alcoholism or drug abuse, the maximum benefit is $25,000 per lifetime while a covered person. The maximum inpatient benefit period is 60 days per calendar year.

# 47, exh. B, p. 9.

The Rider to the Group policy states, in pertinent part:

1. Form G1380.3–5 is amended to delete provision (2) which limits certain benefits for nervous or mental disorders, alcoholism, and drug abuse. The following is substituted in its place:

(2) For care or treatment, whether inpatient or outpatient, of drug abuse, the maximum benefit is $10,000 per lifetime while a covered person. The maximum inpatient

benefit period is as follows: (a) for care or treatment of mental or nervous disorders while confined in a licensed public or private mental hospital, 60 days per calendar year; (b) for care or treatment of alcoholism, 30 days per calendar year and (c) for care or treatment of drug abuse, 30 days per calendar year.

# 47, exh. B., p. 48.

Durham claims that it received bills from Charter Peachford Hospital in Georgia where Robert was treated for drug abuse as an inpatient from October 17, 1988 to November 16, 1988. *See* # 47, para. 9; # 55, para. 8. It is undisputed that the bill for this hospitalization totalled $13,696.35 and that Durham was instructed by Robert's counsel, M. David Blake, by letter dated November 8, 1988, that Robert elected to seek this treatment and that Durham was authorized to make payment to Charter Peachford under the policy. *See* # 47, para. 10 & exh. C thereto. It is also undisputed that Durham actually paid the $10,000 toward that bill. *See* # 47, para. 11; # 55, para 9.

In light of this payment to Charter Peachford, Durham contends that Robert is not entitled to any further benefits vis-a-vis the McLean hospital bill. It contends that Robert's case falls within the limitation of the Rider for treatment for drug abuse, and that he was, in fact, treated for drug abuse at McLean.

Robert, on the other hand, contends that under the Rider, there is *no cap* on the dollar amount (as opposed to a cap on the time period covered) on the benefits available to him for treatment other than for drug abuse, and therefore Durham's denial was improper, or at the very least, a genuine issue of material fact is raised, which precludes summary judgment in favor of Durham. In his Answer to Durham's Eighth Affirmative Defense (# 52, p. 3) Robert asserts that the original policy contained a $25,000 lifetime cap for *alcoholism, mental illness and drug abuse,* but that the Rider to the policy substituted a provision which contained a maximum lifetime benefit for *drug abuse* alone, in

the amount of $10,000.[15]

Robert asserts that, despite Durham's claims that the $10,000 limit set forth in the Rider supersedes the $25,000 maximum of the group policy, the fact that the two maximums are founded upon different conditions or illnesses ("drug abuse" vs "alcoholism, mental illness and drug abuse") creates an ambiguity in the agreement, and that any ambiguity should be resolved in favor of the insured, and against the drafter of the policy, the insurer. *See Bennett Co. v. Fireman's Fund Ins. Co.*, 344 Mass. 99, 103, 181 N.E.2d 557, 560 (1962); *Panesis v Loyal Protective Life Ins. Co.*, 5 Mass.App. 66, 72, 359 N.E.2d 319, 324 (1977) (construe language in fashion so as insured reasonably given to understand intended scope).

■ However, I find no ambiguity. The Rider specifically states that the group policy provision is deleted, and the new provision in the Rider is substituted. The Rider does not state that the group policy provision is amended or modified, or supplemented, but *deleted.* Thus, there is no question that in determining the extent of benefits available under the policy, the group policy provision should be treated as if it did not exist.

However, there is an ambiguity in the policy and the Rider because the provisions are unclear as to what benefits are available when an insured is treated at the same time for a condition which does have a limitation and another condition which does not. Specifically, Robert argues that the *nature* of his treatment while at McLean is a disputed issue of fact, not stipulated to, and that, contrary to Durham's allegations, Robert was treated *not* for *drug abuse,* but for *mental illness.* Therefore, he asserts that if this fact is proven, then there is no lifetime maximum dollar limitation applicable here; rather, there is only a coverage limitation on length of yearly inpatient stays and that these limits have not been exhausted. Under this theory, the entire cost of the McLean hospitalization is covered and should have been paid by Durham.

In the alternative, Robert argues that, at the very least, he has presented sufficient evidence to raise a genuine issue of fact which would preclude summary judgment for Durham on this issue. A review of the evidence is in order.

Patricia contends that although Robert may have had a serious drug problem,[16] both Patricia and Robert nonetheless assert that the nature of the treatment he was expected to receive at McLean was related to his mental illness, and that his drug addiction may have caused a mental condition to surface. They point to comments made by the psychiatrist who examined Robert at the court clinic, i.e., "we are going to try to send him somewhere to get help. Because of the substance abuse, he appears suicidal." *See* # 70 citing Patricia's deposition, page 23, lines 21–23. Additionally, Patricia asserts that it was Robert's suicidal ideation that caused her to seek help for him from the court, and ultimately led to his hospitalization at McLean. *See* # 9, paras. 3–5. Specifically, Patricia states that Robert made a suicide

---

**15.** Robert also contends the treatment at Charter Peachford Hospital was for *alcoholism,* and therefore, the $10,000 payment to Charter made by Durham (for treatment in 1988) was made under the $25,000 maximum benefit provision of the policy, and since the treatment at McLean occurred in 1987 *for mental illness,* he falls within the $25,000 maximum benefit provision. This implies that since Durham only paid $10,000, there would still be $15,000 available under the policy, which could be used to cover the McLean's bill of $14,282.37.

Other than this allegation that the treatment was for alcoholism and not drug abuse, there has been no evidence presented on this issue. Moreover, if the treatment was for alcoholism, then, under the Rider, no dollar cap would apply; rather, a 30 day per calendar year limitation would apply.

However, the argument is nonetheless flawed. The provision in the policy was eliminated and the provisions of the Rider were substituted. Thus, the $25,000 maximum contained in the original policy for "nervous and mental disorders, alcoholism or drug abuse" is of no force and effect.

**16.** *See* # 70. Although Robert has, in this litigation, denied drug abuse or a drug problem, *see* # 73, ("My admission to McLean Hospital in September 1989 was not related to drugs or drug abuse, but was related to my family's allegations that I was suicidal and suffering from a mental illness"), this denial appears to be a recent assertion and clearly contradictory to statements made by Patricia and Robert himself which are contained in the medical records which Robert submitted from McLean.

threat in the presence of his sister and herself during the time material to these issues. *Id.* at para. 3. She further asserts that she had the Pittsfield Police Department take Robert into custody because she was concerned not only about his drug abuse but also because of the suicide threat. *Id.* at para. 5. She noted that at the court hearing, Robert's father testified that Robert was addicted to drugs (cocaine and heroin) and that he might harm himself or others, and that she met with Dr. Gardner, the court psychiatrist, who determined he was suicidal, and suggested placement in a secure psychiatric facility. *See* # 9, paras. 5–7.

**17.** Portions of the medical records from McLean are relevant and state as follows: (dated 10/8/87)

*History of Present Illness*

This is the third psychiatric and first McLean hospitalization for this 34–year–old married, white male whose chief complaint was "I was brought here against my will." The patient has at least a five-year history of drug abuse, having been admitted to Brattleboro Hospital five years prior to admission for a detoxification from heroin. He claims to have used heroin only a couple of times before this admission. He denies any further drug use until very recently, although, according to his wife and family, drug use has continued over the past five years. Nine months prior to admission the patient's wife left him and told him she was going to file for divorce. Since that time, the patient has been abusing intravenous cocaine. According to his wife, his drug use has been out of control and his behavior erratic. She says that he has been using up to $1500 a week worth of cocaine as well as drinking heavily at times and that on one occasion he beat her up and tried, unsuccessfully, to rape her after drinking heavily. The patient denies alcohol use during this time and says that, at most, he was doing a gram of intravenous cocaine per week. He was recently admitted to Ad Care in Worcester for drug detox but left after four days.....

.... The patient has apparently been trying to get his wife to come back to him, unsuccessfully, and his wife and father describe him as being more and more desperate. Five days prior to admission the patient and his wife had an argument about whether she would pursue a divorce. In the context of this argument, he stated, in front of his wife and his sister that he knew he "needed to die" and that he knew enough about drug use to know how to do it. The patient's wife, father and closest friend were extremely concerned about his drug use and possible self-destructive behavior and brought him to Berkshire Mental Health Court Clinic where he was pink-papered to McLean for evaluation and treatment.

As additional support for these contentions, Patricia and Robert cite the McLean's medical records, and argue that, when reviewed as a whole, they are not conclusive as to whether Robert was treated solely for drug abuse. The portion of the records supplied to the court reveal that Robert was diagnosed by Dr. Mark A. Schechter, M.D. and Frances Frankenburg, M.D., psychiatrist in charge, as having an "adjustment disorder with depressed mood. Condition: unchanged" and that he suffered from "mixed personality disorder with narcissistic and antisocial features" *See* # 73, exch. A.[17]

..... His wife and father describe him as being very uninvolved in the business recently with increasingly erratic behavior.....

*Hospital Course*

.... Throughout his hospital course, the patient maintained that there was absolutely no reason for him to be in the hospital and that he had been railroaded in by his wife. He said that her main concern was that she wanted to get control of his money through their divorce. The patient also attributed his hospitalization to a friend of his who was running for City Council in Pittsfield, saying that this friend wanted him locked up so that his drug use would not interfere (sic) with his friend's political ambitions. When confronted with the apparent sincerity of his wife's, his father's and his best friend's concern for him and his out of control drug use, he denied that there was any reason for concern or that he had much of a drug problem at all. The patient put in a three-day notice to leave the hospital and, after several meetings with the patient and with the family, it was decided to go for a commitment on the bases of his *out of control drug use and behavior and his potential suicidality.* (emphasis added).... Psychological testing revealed him to be quite guarded and unwilling to share his real feelings with the examiner. It also noted his great impulsivity and it was felt he was depressed, although not enough so to warrant a diagnosis of major depression. Also noted were a great deal of feelings of anger about women and some confusion around sexual issues. On 10–8–87, another court hearing was held. At this time, Dr. Jacobs presented his evaluation, stating that while the patient had significant problems that require treatment, he did not appear to be acutely suicidal at this time. It was decided by the court that the patient should be discharged outright from McLean, conditional on his entering a drug treatment program voluntarily.

*Diagnosis:*

AXIS I: Cocaine abuse, continuous.
Probable alcohol abuse, continuous.
Adjustment disorder with depressed mood.

While it is abundantly clear from the record that substance abuse was a substantial concern for Patricia and Robert's family, and for McLean for treatment purposes, the assertions by the Patricia and Robert, combined with the medical records, convinces this court that sufficient evidence has been raised for a jury or factfinder to find that Robert was not treated solely for drug abuse [18], and/or to find that he was treated for drug or substance abuse in addition to mental illness, or that he was treated solely for mental illness, including suicidal ideation. It therefore follows, logically, that if a jury or factfinder determines the McLean hospitalization related to treatment solely for drug abuse, then pursuant to the Rider the $10,000 maximum would apply, and since Durham already has paid these benefits toward the Charter Peachford Hospital bill, Robert would not be entitled to any further benefits. Conversely, if a jury or factfinder determined that the course of treatment at McLean was related to treatment for mental illness alone, then a sixty-day cap would apply under the Rider, and the McLean charge would be covered in its entirety.

However, if a jury or factfinder determined that the McLean charge was due to a combination of both drug abuse and mental illness, or even a combination of drug abuse, alcohol abuse and mental illness, there is a real question as to how the Rider should be interpreted, and whether or not any dollar cap would apply. The Rider speaks only in terms of separate diagnoses, i.e., if the treatment is for drugs, then $10,000 is the limit of benefits, if for mental or nervous disorder, then 60 days inpatient is the limit, if for alcoholism, then 30 days is the limit, and so on.

Thus, there is a genuine issue of material fact as to the purpose(s) for which the treatment at McLean was given. Until that dispute is resolved, it cannot be determined what the effect of the Rider is on the outstanding bill for the hospitalization at Mc-

Lean. I shall recommend that the motion for summary judgment be denied to the extent that Durham contends that the policy limits have been reached and, therefore, it is not obligated to pay the McLean bill.

### 3. Alleged Misrepresentation on Application for Insurance

Durham's final argument in support of its motion for summary judgment is that it has no obligation to pay any benefits to Robert for the McLean hospitalization because of the failure of the insured to disclose Robert's prior hospitalization for substance abuse on the application. Specifically, Durham alleges that on or about May 4, 1987, Patricia and Robert, in an attempt to obtain health insurance coverage, prepared an application for insurance coverage and submitted it to United Plans, Inc., which acted as the Third Party Administrator for Durham. *See* # 47, paras. 3–4 and exh. A; # 55, paras. 1, 4.

The application requested various background information from the applicant (in this case, Patricia) and for dependents (Robert) for whom coverage was sought. The application also contained five questions with subparts, relating to statements concerning the applicant's and dependent's health. Questions 1(e) and (3) read as follows:

(1) Have you or any of your eligible dependents ever been treated for or ever had any known indication of

\*     \*     \*     \*     \*     \*

e) Excessive use of alcohol, narcotics, stimulants, sedatives or hallucinogenic drugs; or consultation, treatment, therapy or counseling for psychiatric illness or problem relating to personality or mental state?

3) Have you or any of your eligible dependents consulted a doctor or other medical practitioner or been a patient in a hospital, clinic, sanitorium or other medical facility within the past five years?

The application further provided that if any question was answered "yes", then de-

---

Condition: unchanged
AXIS II: Mixed personality disorder with narcissistic and antisocial features.
Condition: Unchanged.
AXIS III: No diagnosis

**18.** The medical records provided to the court do not specifically reveal any course of treatment outlined for Robert which addresses the drug abuse problem.

tails were to be supplied, and space was provided on the form for listing such information. Patricia completed the application and questionnaire for both herself and Robert. To question # 1(e), Patricia checked off the box under the heading "no", meaning that she answered the question in the negative. To question # 3, Patricia, on behalf of Robert, checked off the box under the heading "yes", an affirmative answer. In the space provided below the questions she provided information that in February 1984, Robert underwent a hernia operation and had fully recovered. The name of the doctor was also provided.

The application also contained a declaration which was located at the last four paragraphs preceding the signature lines containing both signatures (signed by Patricia for both herself and Robert). The Declaration, in capital letters, stated, in relevant part:

I DECLARE THAT THE INFORMA-TION IN THIS APPLICATION IS FULL, COMPLETE AND TRUE TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT ANY MIS-STATEMENTS, OMISSIONS OR MIS-REPRESENTATIONS MAY RESULT IN THE RESCISSION OF THIS IN-SURANCE COVERAGE, AND THAT NO CLAIM WILL BE PAID IN THAT EVENT I APPLY FOR THE INSUR-ANCE FOR WHICH I AM NOW OR MAY BECOME ELIGIBLE AND AU-THORIZE DEDUCTIONS FROM MY EARNINGS SUFFICIENT TO COVER MY CONTRIBUTIONS, IF ANY.

Subsequently, based on this application, effective June 1, 1987, Patricia and Robert became participants in the plan. Durham alleges in its motion (and raises this as an affirmative defense) that the Patricia and Robert materially misrepresented the status of Robert's health in their responses to ques-

tions # # 1(e) and 3 insofar as they failed to disclose the fact that Robert was treated on an inpatient basis at Brattleboro Hospital for drug abuse, and that this treatment occurred sometime in 1983, within the 5 year period prior to the execution of the application. The fact of hospitalization at Brattleboro is not a disputed fact among the parties. Durham contends that such information should have been disclosed in answer to the questions in the application and submits that, had it known of the information, it would have either refused to issue the policy or would have rescinded the policy upon discovering the information. See # 55, paras. 11–14.[19]

█ In opposition to these assertions, Patricia and Robert put forth various defenses. First, Robert denies liability for the misstatement since he did not complete the application. This assertion is without merit since Patricia clearly acted as his agent, see # 61, para. 2, and there is no genuine dispute in this regard, especially in light of the fact that Robert is asserting a claim for benefits under the policy, and has accepted benefits with regard to the Charter Peachford Hospital bill. He cannot claim to be a beneficiary of the policy on one hand while denying any involvement with the policy on the other. Clearly, he seeks to take advantage of the application by asserting his entitlement to benefits. Thus, any misrepresentation made by Patricia must be imputed to Robert for the purposes of analyzing the claim of material omissions from the application.

Next, Patricia and Robert submit that Patricia, when filling out the application, made an honest mistake in that she believed the Brattleboro hospitalization did not occur within 5 years of the date she made the application; rather, she thought it had occurred prior to 1983. See # 61, para. 2. She therefore claims she answered the questions to the best of her knowledge. She claims she

19. On page 16 of the policy (# 47, exh. B) under the section entitled "HEALTH STATEMENT AS A BASIS FOR INSURANCE," the following language appears:

"Any material omission about health history or status may be cause for us to decline a claim or rescind coverage. A photostatic copy of your application has been attached to this

certificate at its issue. Please read the questions and your answers. If you failed to provide full, complete and true answers, you should provide us the correct information within 10 days of receipt of these forms. After 2 years from the effective date of the covered person's coverage, no misstatements, except fraudulent misstatements, shall be used to rescind coverage or deny a claim."

had no intention of deceiving Durham when she completed the application. *Id.* Thus, she denies any fraudulent misstatements were made. It should be noted that Patricia does not address the misstatement alleged to be found in question #1(e), in which she denied Robert had any drug or mental problem.

Patricia further points, as recited in footnote 19, *supra*, that under the terms of the policy:

> After 2 years from the effective date of the covered person's coverage, no misstatements, except fraudulent misstatements, shall be used to rescind coverage or deny a claim.

#47, exh. B, p. 16.

Patricia submits that she was never informed of Durham's allegations of misrepresentation within the two year period commencing June 1, 1987, which is the effective date of coverage. Thus, she contends that Durham would have to prove the misstatement was made fraudulently, which she disputes.

■ This is an erroneous reading of the language of the policy provision. That provision implies that absent fraud, any misstatements made would not serve as a bar to a claim for benefits which accrued after the two-year period, and Durham could not rescind the policy on the grounds of misrepresentation. Thus, for example, if Robert's hospitalization at McLean had occurred *after June 1, 1989*, then Durham could not deny a claim based on misstatements on the application, again unless there was fraud involved. It would certainly be illogical to assume that, as Patricia asserts, if Durham does not discover the misstatements and notify her of the discovery within 2 years from the effective date of the policy, then Durham cannot rescind the policy or deny a claim which arose during the initial two-year period.

■ Next, Robert asserts that under M.G.L.A., ch. 175 § 186,[20] no misrepresentation will be deemed to be *material* or work to void a policy unless it was made with actual intent to deceive or if the matter which was misrepresented increased the risk of loss to the insurer. On this issue of "materiality," Durham has the burden of proving the misrepresentation was material. *Pahigian v. Manufacturer's Life Ins. Co.*, 349 Mass. 78, 85, 206 N.E.2d 660, 665 (1965); *Ayers v. Massachusetts Blue Cross, Inc.*, 4 Mass.App. Ct. 530, 535–6, 352 N.E.2d 218, 222–3 (1976). Robert contends there is no evidence to show that Patricia intended to deceive Durham, nor is there any evidence to show that, had the prior Brattleboro hospitalization been revealed to Durham on the application, it would have amounted to an increased risk of loss to Durham, or that Durham would, as part of the terms of the policy, have declined coverage, or would have raised the premiums.

■ In any event, whether the misstatement was material in that it increased the risk of loss for the insurer is ordinarily a question of fact. *Davidson v. Massachusetts Casualty Ins. Co.*, 325 Mass. 115, 119, 89 N.E.2d 201, 204 (1949) ("It could not have been said as a matter of law that degenerative joint disease increased the risk of loss" to health and accident insurer). In the case of *Schiller v. Metropolitan Life Ins. Co.*, 295 Mass. 169, 177, 3 N.E.2d 384, 388 (1936), the Supreme Judicial Court wrote that "[w]hether the existence of certain ailments increased the risk of loss ... commonly is a question of fact, not of law." It noted that questions of fact are presented when the condition which was not disclosed is diabetes, kidney ailments, Bright's disease, angina pectoris, sarcoma, etc. *Id.* However, the risk of loss can said to be increased as a matter of law when what was not disclosed is alcoholism, cancer, or consumption or the insured's age is misrepresented to be five years less than it actually is. *Id.*

At first blush, alcoholism would seem to be most analogous to drug addiction. However, the facts of the two cases cited by the court in *Schiller* are readily distinguishable from the facts of the instant case. Neither involved the issue of failing to report a prior

---

20. Insofar as a genuine issue of fact is presented with respect to the misrepresentation issue on other grounds, it is not necessary for this court to determine what law is controlling, i.e. whether Massachusetts law controls, even though the claim is governed by ERISA, although Durham does not dispute these assertions by Robert.

hospitalization for alcoholism; rather, in each case there was evidence that the insured was an alcoholic and used alcohol to excess at the time the application was signed. *See Langdeau v. John Hancock Mutual Life Ins. Co.,* 194 Mass. 56, 57, 80 N.E. 452, 454 (1907); *Rainger v. Boston Mutual Life Ass'n.,* 167 Mass. 109, 110, 44 N.E. 1088, 1089 (1896).

More modern cases seem to continue the distinction set forth in the *Schiller* case. *See Ayers v. Massachusetts Blue Cross, Inc., supra,* 4 Mass.App.Ct. at 536, 352 N.E.2d at 222 where the Court noted that although the question is usually one of fact, "[m]isstatements [increase the insurer's risk of loss] as a matter of law ... when they conceal the presence of certain diseases, including cancer." *Id.* citing *Lennon v. John Hancock Mutual Life Insurance Co.,* 339 Mass. 37, 39, 157 N.E.2d 518, 519 (1959) (cancer); *Pahigian v. Manufacturers' Life Ins. Co., supra,* 349 Mass. at 85, 206 N.E.2d at 665–6 (Hodgkin's Disease). *See also Warren v. Confederation Life Association,* 282 F.Supp. 375, 376 (D.Mass.1968) (Caffrey, J.) (seizure disorder, compulsive disorder, epilepsy).

■ Durham has not submitted to the Court any law in support of its contention that prior drug addiction is similar to "certain diseases, including cancer" and thus increases the risk of loss as a matter of law. Upon the record currently before me, I find the issue is one for the factfinder.

■ There is an added element. Patricia and Robert contend that the misstatement on the application could not have been "material" since Durham did, in fact, learn about the Brattleboro Hospital stay, and after learning of that hospitalization, went on to pay benefits under the policy toward the Charter Peachford Hospital stay in 1988. The maximum policy amount of $10,000 was paid on August 16, 1989. *See* # 68, exh. A.

Specifically, Patricia alleges that five months before Durham paid the Charter Peachford bill (in March 1989), Durham had requested, and had obtained, a release from Robert Lasher to obtain his medical records from Brattleboro Hospital. *See* # 61, para. 4. Durham does not deny the fact and does not contend that it did not act to obtain the records based on the release. Given that Patricia and Robert are the parties opposing summary judgment, it is a fair inference to draw · in Patricia and Robert's favor that shortly after obtaining the releases in March, 1989, Durham knew all the pertinent information about the Brattleboro hospitalization and nonetheless honored the contract of insurance by paying for Robert's treatment for drug addiction at Charter Peachford. Patricia and Robert argue that since Durham failed to deny the claim based on the misrepresentation in the application with respect to the Charter Peachford bill, even though Durham knew of the misrepresentation, then the misrepresentation could not have been considered "material" to Durham. Moreover, they contend that the act of paying the claim for the Charter Peachford hospitalization was an affirmation of Durham's obligation under the contract and resulted in a waiver of Durham's right to assert a material misrepresentation claim, or to claim it suffered an increased risk of loss. *Oakes v. Manufacturers' Fire & Marine Ins. Co.,* 135 Mass. 248, 249 (1883).

In this connection the case of *Shapiro v. American Home Assurance Co.,* 584 F.Supp. 1245, 1248–50 (D.Mass.1984) is instructive. The burden on an insurer who claims that a misrepresentation materially increased the risk of loss is to demonstrate by a preponderance of the evidence that the statement is:

... one so central to the risk being insured that the insurer would be expected to take it into consideration in making the underwriting decision.

\* \* \* \* \* \*

Materiality has long been defined as something "the knowledge or ignorance of which would naturally influence the judgment of the underwriter in making the contract at all, or in fixing the premium."

*Shapiro v. American Home Assurance Co., supra,* 584 F.Supp. at 1250 quoting from *Daniels v. Hudson River Fire Insurance Co.,* 66 Mass. (12 Cush.) 416, 425 (1853). As has been demonstrated, on the present record, I find that there are material issues of disputed fact which have to be resolved before the above-quoted standard may be

applied to decide whether the misrepresentation did increase the risk of loss. Summary judgment is, therefore, inappropriate.

## VI. RECOMMENDATION

Accordingly, I RECOMMEND that Durham's Motion to Dismiss the Third Party Complaint, or in the Alternative, for Summary Judgment (# 54) be DENIED.

## VII. REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir.1983). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

March 31, 1993.